CALVIN GREEN and SOPHIA A. GREEN, Respondents, v. SECURITY MUTUAL LIFE INSURANCE COMPANY, Appellant.

Kansas City Court of Appeals, June 28, 1911.

1. RESCISSION: Fraud: Life Insurance: Equity. Appellant was an assessment life insurance company organized under the laws of New York. Respondents held a $1000 policy in that company. When the policy had run about ten years appellant persuaded respondent to exchange it for a new form of policy. The old policy was by its terms a level premium policy. The new one was a twenty-payment policy. In making the exchange, appellant's agent presented to the insured for his signature a note for the first year's premium, an application, and a certificate of loan. The certificate of loan was an acknowledgment of an interest-bearing indebtedness of $299.10 which was a lien on the policy, and it carried itself without attention from the policy holder until his death, when so much of it as was not absorbed

by dividends would be deducted from the face of the policy. The appearance of the papers and the representations and conduct of appellant's agent deceived respondent, and lead him to sign the papers, including the certificate of loan, without knowing what the latter was, and there was nothing on the face of the new policy to disclose the existence of the certificate of loan. The evidence was sufficient to justify a court of equity in cancelling the new policy and reinstating the old.

2. ———: ———: ———: **Delay.** Respondent did not discover that he had signed the certificate of loan until four years afterwards. Within a few days after the discovery he brought a suit to cancel that certificate only, on the theory that the certificate of loan was a separate and independent contract in itself. On the trial of that case it developed, or appeared to develop, that the certificate of loan was a part of the general contract of exchange of policies; at any rate plaintiff concluded that it would be safer to dismiss that action, and he dismissed it, and instituted this one. He did not lose his rights by delay in bringing this action.

3. ———: ———: **Part of Contract.** A party cannot rescind one part of an indivisible contract and hold on to the other part.

4. **DISTINCTION IN LAW AND EQUITY.** In a law action based on a rescission the rescinding party must tender to the other all that the former has received. In an equity action it is sufficient if he makes the tender in his bill.

5. ———: **Tender: Effect of Paying Premiums Under New Policy.** Plaintiff, by paying the premiums under the new policy did not thereby forfeit his right to compel the reinstatement of the old policy, the premiums under the new policy being larger than those under the old, there being no evidence that he has received any benefits by the exchange, and there being no difficulty in putting the parties in *statu quo*.

6. **TENDER: Putting Parties in Statu Quo.** Where it is impossible to put parties in *statu quo*, if the impossibility results from the fraud of the defendant without fault on plaintiff's part, rescission may be granted by a court of equity, and the court will do justice between the parties as nearly as the circumstances will permit.

7. **PAYMENTS MADE UNDER OLD CONTRACTS: Restoration.** A reinstatement of an old policy having been ordered, the plaintiffs are entitled to a return of so much of the premiums paid on the new policy as the sum of those premiums would exceed the sum of the premiums due on the old policy.

8. **FRAUD: Negligence.** A person who is defrauded is not to be denied relief because of his negligence in permitting himself to be

defrauded unless the negligence amounts to the violation of a positive legal duty, and this is especially true where the rights of innocent third persons have not intervened.

9. ————: **Equity: Unraveling Means of Accomplishing Fraud.** Where fraud is established a court of equity has power to act even though the evidence may not show the precise method by which the fraud was accomplished.

10. **PLEADING: Waiving Objection to Sufficiency of Petition.** The petition charged that plaintiff did not execute the certificate of loan, and that if he signed it his signature was procured by fraud. The petition did not contain contradictory allegations. In the absence of a motion to make it definite the petition is good.

11. **LIFE INSURANCE: Level Premium Policy.** Where a policy calls for a fixed annual premium, with no provision for an increase in the premium rate, it is, under the law of Missouri, a level premium policy, even though issued by a company oragnized on the assessment plan.

12. **CONFLICT OF LAWS: Lex Loci Contractus.** Parties may, by their contract, establish the place according to the laws of which the construction of the contract shall be determined.

13. **CONTRACTS: Divisibility.** A divisible contract is one in its nature and purpose susceptible of division and apportionment, having two or more parts in respect to matters and things contemplated and embraced by it, not necessarily dependent upon each other, and not intended to be by the parties to it.

14. ————: ————: **Mutuality of Intention.** The contention by one of the parties that a contract is indivisible is not conclusive.

Appeal from the Clay Circuit Court.—*Hon. Francis H. Trimble*, Judge.

AFFIRMED.

*Conkling, Rea & Sparrow* and *H. D. Hinman* for appellant.

*E. E. Ball, Claude Hardwicke* and *Busby Bros. & Withers* for respondents.

BROADDUS, P. J.—This is an action in equity to set aside and cancel a life insurance policy issued by defendant to plaintiff in exchange for a prior policy, to reinstate the old policy, and for other relief the nature of which will appear in the statement of the case. The circuit judge before whom the cause was tried filed a written statement and opinion which so comprehensively, clearly and accurately expresses our own views of the case that we adopt them as our opinion. They are as follows: "Plaintiff, Calvin Green and Sophia A. Green, husband and wife, and, respectively, holder of and beneficiary in a life insurance policy, No. 57234, issued by defendant in exchange for a former policy, No. 7959, bring this suit in equity to set aside such exchange, cancel the new policy, reinstate the old, and to recover the excess premiums paid on the new policy.

"The ground of their complaint is that fraud was practiced by defendant's agent, upon Calvin Green at the time of the exchange of such policies by obtaining, without Green's knowledge or consent, his signature to a certain 'certificate of loan,' claimed by defendant to have been executed simultaneously with the agreement to exchange policies, and with the application and payment of premium for the new one.

"The certificate of loan states that defendant has loaned on policy No. 57234 the sum of $299.10, which, with six per cent interest from date, to wit, October 17, 1903, shall be a lien on the policy and shall be deducted from the amount due thereon when the policy is paid.

"The defendant is a life insurance corporation organized under the laws of the State of New York and, by authority, doing a general life insurance business in the State of Missouri. Prior to 1899 it was known as Security Mutual Life Association, but in that year it was reincorporated and its name changed to the one by which it is sued.

"The original policy, No. 7959, was issued October 13, 1893. Calvin Green was at that time thirty-two years of age, and, under this policy, he was to pay four premiums a year of $4.78 each, or $19.12 yearly. No provision existed in the policy for any increase in the premium rate, and none whereby the insured was bound to pay more than the sums specified therein. No reference is made in the policy to the articles of incorporation nor to the by-laws; but by section 6 of the articles, it is provided that policy holders shall be liable only for the fees, dues and assessments specified in their respective policies. And section 1, article 7, of the by-laws states that the amount of fees and dues and the amount and payment of premiums shall be determined by the board of directors and shall be stated in the policy issued to each member; while section 4, article 2 provides that 'the policy shall be in the form prescribed by the board of directors and shall contain the specific terms of the agreement or contract between the association and the insured to whom it is issued." According to Missouri law, therefore, the policy was an old line, level premium policy, notwithstanding the fact that it was issued by a company organized on the assessment plan. [Jacobs v. Life Assn., 146 Mo. l. c. 537.] If this be true, then the association had no right to increase the rates thereon. There is a provision, however, in the policy stating that 'the place of this contract is expressly agreed to be . . . in New York.' Under the general rule defining *lex loci contractus*, it is within the power of the parties, by the terms of their contract, to establish the place according to the laws of which the construction of the contract shall be determined. [22 Am. and Eng. Ency. of Law (2 Ed.), page 1325.] By another clause in the policy the payment of any money thereunder was conditioned upon its being realized from the mortuary payments made by the members or from the reserve fund of the Association. And section 5 of chapter 175

of the New York Insurance Laws offered in evidence says that an association issuing such a policy shall be deemed to be engaged in life insurance business on the assessment plan. It may be that under the law of New York the policy in question is an assessment policy. I have not had opportunity to examine this question. I have not gone into it partly because, in my opinion, its determination is not absolutely essential to a proper decision of this case: The question is material only as bearing on the truth or falsity of the statement made by the agent, Simmerman, to Green as hereinafter recited, that if he did not exchange his old policy for the new one the company would have to raise the rate. The truth or falsity of this statement is merely a circumstance bearing on whether fraud was practiced on Green at the time of the exchange. If the court can say from the evidence that fraud was practiced, without determining whether this particular statement was true or false, then the question whether the old policy is an assessment policy or not is not particularly important.

"Green paid the premium required of him by this policy, and it was in full force and effect at the time he exchanged it for the new policy, as hereinafter stated.

"After defendant had reincorporated into its present status, it began getting the policy holders under the old regime to exchange their policies for others in the new organization, and one W. W. Simmerman was one of defendant's agents engaged in this work.

"On May 11, 1904, Simmerman appeared at Carrollton, Missouri, where plaintiffs resided, and, over the telephone, arranged for Green to meet him at the hotel, and to bring his old policy with him. They met in the hotel lobby about 6 o'clock in the evening. Simmerman introduced himself and told his business. He showed Mr. Green a copy of the new policy, and

represented that it was much better than the old one. He pointed out the benefits mentioned in the new policy and told him that in case of his death his beneficiary would receive not only $1000 due on the policy but also certain guarenteed additions specified therein. He also gave him a card showing such guaranteed additions, and further told him that after the expiration of three years he could borrow money on his policy. His attention was called to the fact that he would have to pay premiums on his old policy as long as he lived, and he was then told that if the policy were not exchanged, the company would raise the rate thereon. The proposition was then made to exchange the old policy for a new one on the twenty payment plan and date it back ten years to the date of his policy, and, while the future premiums thereon would be $20.08 semi-annually instead of $4.78 quarterly, still they would cease entirely at the end of ten years, and upon Green's death his wife would receive the $1000 plus the guaranteed additions. In short, he was offered a twenty payment policy on which ten years have already elapsed, and is artfully led to believe that the payments he has made for ten years on his old policy will take the place of the first ten years of the new one. In fact, he is told this is effect, because Green asked him if the $20.08 semi-annually was all he would have to pay and Simmerman assured him it was. Not a word was said to him about any back premiums to be paid on the new policy, nor was any note or certificate of loan or lien on the policy for the payment of back premiums or the creation of a reserve fund for it mentioned in any way. All that Green would have to do would be to sign a note for $20.08, the first premium, and an application for the new policy. Simmerman was in a great hurry; said he wanted to catch a train for Kansas City, and told Green that if he was going to exchange policies he must make up his mind right away.

"Green, thus suddenly confronted with this problem, agreed to make the exchange, and Simmerman had him to sit down at a small table in the corner of the lobby, whereon he had a number of papers and writing materials.

"Simmerman, standing at his side, first handed him the application for the new policy and asked him to read it over, which Green did. Simmerman then laid the application to one side and handed Green the note, which Green read over and then signed. Thereupon Simmerman laid on the table the application— or what Green thought was the application—and indicated the place where Green was to sign and Green attached his signature. About two or three minutes elapsed between the time Green read over the application and the time he signed it. The moment Green finished signing his name, Simmerman quickly picked up all the papers and put them away, handed Green a receipt for his old policy and hurriedly left the hotel. The entire conversation and transaction did not occupy over fifteen or twenty minutes.

Neither the card given Green by Simmerman, nor the application which he read over before signing, contained any reference to a 'certificate of loan,' or other lien, whatever. And no mention is made of it in the new policy. It says it is "granted as of date October 17, 1893, in consideration of the surrender and cancellation of policy No. 7959 and of the application for said policy and the application for this policy and of the payment in advance, October 17, of $20.08 and of the payment of a like amount on or before the 17th days of October and April in every year thereafter until premiums for twenty years have been paid, or until the prior death of the insured." These "payments in advance" evidently refer to the new premiums to be paid under the new policy, but even if they can be tortured into a cryptic reference to the "certificate of loan" as a payment in advance of all the premiums

due in October and April in every year thereafter, meaning after October, 1893, the date of the old policy, still they cannot be said to furnish to the insured any notice of the existence of the certificate of loan. The words "subject to any indebtedness" in the paragraph headed "distribution of profits," cannot be said to refer to the certificate of loan, since they occur after the paragraph authorizing the loan of the net reserve to the credit of the policy after it has been in effect three years, and the natural and only inference would be that these words referred to this loan if made. These vague, equivocal and misleading passages in the new policy not only do not notify the insured of the "certificate of loan," but they show an arrangement whereby its existence is artfully concealed, and the work of deceiving old policy holders made easy.

"Green is positive that he was to execute only two papers, the note representing the first new premium, and the application, in order to effect the exchange; and he knew nothing of any certificate of loan, until in July, 1908, when, having learned that the company was claiming to hold one against his policy, he wrote to it asking if such were the fact, and in the latter part of that month received a reply in the affirmative. Suit was thereupon instituted early in August, 1908, to cancel of loan, and, after a trial at the January, 1909, term, non-suit was taken and the present suit instituted shortly thereafter.

"The application and the certificate of loan are printed on paper of the same color, size, shape and general appearance. The printing on each is similiar in type, size and arrangement on the page. The word 'application' on one, and the words 'certificate of loan' on the other are on the left-hand margin instead of at the top.

"By the terms of the certificate, there is nothing for the policy holder to do with reference to it, after it is once signed, which would call his attention to its

existence. The interest thereon is simply added to it until the end of the distribution period, at which time whatever profits accruing to the policy shall be applied to the payment of the loan. If the profits do not pay the loan, the balance remaining unpaid is continued as a loan with the same interest, and the dividends accuring on the policy thereafter are credited on said loan annually, and, if loan is not fully paid at death of insured, the amount due thereon is deducted from the face of the policy. By the terms of the application the policy holder agrees, on behalf of himself and his beneficiary, that in the matter of the distribution of profits, the apportionment of dividends and the determination of the amount due to any policy, he will ratify and accept whatever the company sees fit to do in the premises. So that when once a policy holder's signature is obtained to the certificate of loan, it can perform its function silently and without warning or disturbance to the policy holder in the least; and it never appears on the scene until it is needed for the purpose of making a settlement with the beneficiary after the policy holder's death. Then it is forthwith brought to light; and, as the company's methods of distributing profits has already been ratified, this hitherto unobtrusive little instrument becomes a powerful and all important factor in the adjustment of the company's liability. It is apparent that these circumstances show that all the papers, if not actually designed to perpetrate a fraud, are admirably well adapted for that purpose, and afford a strong temptation to the agent to use fraud and stealth to obtain the insured's signature to the certificate of loan without his knowledge. If the loan were called to the insured's attention, it would likely cause the negotiations to fail; while if once his signature to it can be obtained without his knowlege, the chances of discovery are so slight and so remote as to remove all fear of the consequences. In other

words, the circumstances themselves show not only an arrangement whereby fraud may be perpetrated, but which also presents a strong temptation to the agent to do what the plaintiffs claim in this case that he did do. Moreover, these circumstances show it was a comparatively easy thing to accomplish. Much easier than to forge the signature outright, and much safer for the company afterward.

"I have studied the evidence carefully as it came from the witness stand, and am convinced that Green knew nothing of any certificate of loan, nor was he in any way told that he would have to pay back premiums, or give a note for them, or create his own reserve fund, beyond what he had already paid. Under these circumstances does it matter much whether the old policy is an assessment or level premium policy? He is told the company will have to raise the rate, and, under the new, it is more than doubled; but, as a partial recompense for such great increase in the future, the policy is dated back to his old policy so as to give him the benefit of the payments he has made, and these greatly increased payments will cease at the end of ten years. All this without mentioning the certificate of loan, and in the face of his question as to whether he shall have to pay anything further.

"The evidence shows that the signature to the certificate of loan is Green's signature; but I am convinced beyond question in my own mind that he did not sign it knowingly. I am convinced of this from his testimony alone, when considered with the attendant circumstance and the motives and influences operating upon the agent, Simmerman. His conduct, his false statements in comparing the old and new policies, his pretense of lack of time and great hurry, his demand for an immediate decision, all show an evident purpose to defraud. Several other policy holders testified to the same method of procedure on the part of Simmerman with them; that they were not told of any neces-

sity for any loan to cover back premiums or to create a reserve fund; and that they did not knowingly sign a certificate of loan. Of course, the fact that they did not knowingly sign it would not show whether Green did or not, but it does show an intention on the part of Simmerman to conceal the certificate of loan from the policy holders and to affect an exchange of policies without letting them know of it. In other words, it shows a general scheme or purpose on his part to defraud.

"Green having signed the certificate of loan without knowledge of it, was he guilty of negligence? I think not. He read over both the application and note before he signed them. They were the only obligations he was to incur in order to get the new policy, according to the representation and assurances made him. He was first handed the application and allowed to read it over, which he was careful to do. Then, before he could sign it, the application is laid to one side and he is handed the note to read and then is allowed to sign it. Then he is handed the application or what is apparently the application, he had read over a moment before, and he signs that also. It is during the few moments he is engaged in reading and signing the note that the agent performs his little feat of legerdemain by which the certificate of loan is slyly inserted in the routine of signing, and Green's signature is obtained to that as well as to the application, both of which are as nearly alike as two papers of that character could possibly be.

"It developed in evidence, on cross-examination, that he also signed a receipt surrendering a bond he held under the old policy, but as that was for an insignificant sum, possibly seventy-five cents, his failure to remember signing the receipt for that would not raise the presumption that he had also forgotten his signing an obligation for almost three hundred dollars. In fact, the requirement of this additional

signature only rendered it easier to obtain his signature to the certificate of loan, since it afforded a reason for more signatures than merely the two to the note and application.    On this question of plaintiff's negligence Pomeroy's Equity, volume 2, page 322, says: 'Each instance of negligence must depend to a great extent upon its own circumstances.    It is not every negligence that will stay the hand of the court.    The conclusion from the best authorities seems to be, that the neglect must amount to the violation of a positive legal duty. The highest possible care is not demanded.'

"In addition to this, the parties to this suit are the same as they were at the time in controversery. No rights of innocent third parties intervene.    Shall a court of equity close its eyes to the fraud and search out and punish the negligence?    If Green had blindly and without question signed every paper put before him, without reading or being led to think he had read them, he ought perhaps to be held to all contracts thus signed.    But he did not do this.    He was approached by the agent on an exceedingly technical subject, concerning which he could not possibly inform himself; he is told numerous false statements concerning his status and rights therein; a new proposition on this technical subject is presented to him; he is told that he has only two things to do in order to get the benefit of this new proposition; sign a note and application and surrender his old policy.    He carefully asks if the premium stated is all that he will have to pay, and is assured that it is.    He also takes the precaution to read over the obligations he is to sign, and then, hurried by the agent, he signs what he thought he had read over.    Under these circumstances there was no negligence such as would excuse the fraud.    In fact, strickly speaking, negligence never does excuse fraud. In those instances, where it is loosely said to do so, it is rather negligence taking the place of fraud; that

159 App.—19

is to say, the condition from which the party complaining seeks to escape was brought about by his negligence and not by the fraud.

"It is contended by the defendant that plaintiff ought not to recover because the evidence does not show the precise method by which the signature was fraudulently obtained; and that defendant's objection to the introduction of any evidence under the petition ought to have been sustained. In answer to the first part of this contention, it may be said that courts of equity, sitting to redress wrongs, are concerned more about the existence of the fraud than they are about the protean methods of its accomplishment. If, after uncovering a fraud, they must understand and follow all its devious and underground ways before smiting it with the power of their might, then, in many cases, they would be painfully weak and helpless.

"So far as the sufficiency of the petition is concerned, no motion to make it more definite and certain was filed, and the mere objection to the introduction of any evidence cannot prevail, provided the court has jurisdiction and the petition contains any cause of action however imperfectly stated. The petition in this case does not contain contradictory allegations that mutually destroy each other. If it did, the objection to the introduction of any evidence thereunder might be good. In substance, the petition alleges that the certificate of loan is not plaintiff's act; that he never executed it; that if his genuine signature is to the instrument it was obtained fraudulently by substituting the certificate for the application, or by some other trick, whereby plaintiff's signature was obtained without his knowledge or consent.

"The further allegation that the signature is perhaps not genuine, but was forged, is not contradictory of the fundamental allegation of the petition, namely, that the certificate of loan was never executed by him. The petition, therefore, did state a cause of action,

and the objection to the introduction of any evidence thereunder was properly overruled.

"Much more serious questions are raised, however, by defendant's contention that plaintiffs ought not to recover; first, because Green did not rescend promptly and notify defendant thereof; second, that he did not, as a condition precedent to his right to rescind, tender back to defendant, either before suit or on trial, that which he had received under the new contract, and third, that he did not rescind *in toto*, but elected, after discovery of the fraud, to stand by the trade and to insist on his rights under the new policy. These features of the case embody the real difficulty the court experienced in reaching a satisfactory conclusion in the matter, and are what caused it to hesitate before rendering judgment herein.

"In arriving at a correct solution of these phases of the case, we must always bear in mind the peculiar relative position and situation of the parties hereto; and because of this, resort must be had to general principles rather than to adjudicated cases not based on similar facts.

"As hereinbefore shown, after Green's signature to the certificate of loan had been once obtained, there was nothing to call his attention to it, and, therefore, he could not, by reasonable diligence, have discovered its existence. So that his delay in bringing suit from 1904 to 1908, and his payment of premiums on the new policy during that time, and his claiming insurance thereunder, ought not to be held against him. In the latter part of July, 1908, he learned for the first time of the existence of the certificate of loan, and received a copy of it. On August 7, thereafter, he instituted suit to cancel the certificate of loan, but did not ask for the recission of the new and the reinstatement of the old policy. After the evidence was submitted in the case at the January, 1909, term, plaintiff took a non-suit and on February 9, 1909, instituted the present

suit to annul or rescind the entire new contract and re-instate the old.   Now, if the certificate of loan was not a part of the consideration for the new policy   or in other words, if it was a separate, divisible and in-dependent contract in itself, having no connection with the delivery and acceptance of the new policy—then, of course, the first suit to cancel the certificate of loan could have been maintained without disturbing the new policy.   In fact, this first suit was not to rescind a contract acknowledged by plaintiffs to have been entered into and from which they seek to escape on account of fraud; but it was a suit to have the court to declare that which was apparently a contract to have no existence as such.   The petition therein seems to have proceeded on that theory.   And it must be remembered that, from plaintiff's standpoint, the certificate of loan had no connection whatever with the issuance or validity of the new policy.   He knew nothing of the certificate when he accepted the policy and agreed to pay premiums thereunder.   Neither the application for the new policy nor the new policy itself says anything about the certificate, nor of its being founded upon or having any connection with it whatever.   On the face of the certificate, it is a straight-out, unconditional loan of $299.10 on the policy, stating that Green has borrowed that sum on it.   So that on the face of the papers there is nothing anywhere to show that the certificate is not what it purports to be; a separate, divisible and independent contract, but is merely one of several agreements entered into simultaneously as a part of one general contract.   Of course, if it was the latter, then the suit to cancel the certificate alone could not have been maintained. After hearing the evidence, and having a more thorough knowledge of the facts and of defendant's contentions in the matter, plaintiffs deemed it advisable to take a non-suit and bring another which would conform more nearly to the possible facts and defendant's

theory of the case. The situation of plaintiffs was different in that suit from that of a party seeking to set aside one part of a contract he knew he had entered into, and which he knew, at the time he entered into it, was inseparably connected with the entire agreement. In such case, the party knows he has entered into two branches of one in divisible general contract and, therefore, by holding on to one branch of it, he necessarily elects to ratify the whole, and will not be allowed to disaffirm one branch while holding on to the other. But in the case of the plaintiffs, there is nothing in their minds, nor on the face of the contracts themselves, to show that the certificate of loan is only one branch of the contract and that the other branch, the new policy, is dependent upon it. In fact, the face of the certificate is quite to the contrary. It shows merely a straight-out loan made on the policy, and, by necessary inference, must have been executed, not in connection with or as a foundation of the new policy, but after it had come into existence as an independent contract between the parties. They had the right to proceed on the theory that it was a divisible contract. 'A divisible contract is one in its nature and purpose, susceptible of division and apportionment having two or more parts in respect to matters and things contemplated and embraced by it, not necessarily dependent upon each other nor is it intended by the parties that they shall be.' The question whether it is divisible or not 'depends largely upon the intention of the parties as determined from the language of the contract and the subject-matter.' [7th Am. and Eng Ency. of Law (2 Ed.), page 95.] Even if plaintiffs at the time of discovering the fraud, were made aware of defendant's contention that the contract of exchange was entire, still this should not prevent them from proceeding on the theory that it was divisible, since it was clearly divisible, so far as plaintiff's intentions and the language of the contract were concerned.

They might well proceed upon the theory and obtain the court's judgment as to whether the contract was entire or divisible. And it might be that the court could have, in that first case, held that the contract was entire and yet proceeded to give relief by requiring as a condition precedent thereof that plaintiff should bring in for cancellation the new policy and have the old one reinstated under an amended prayer. But after the evidence was in and the court had given an intimation that in its opinion the contract was entire and for that reason relief could not be granted, ought plaintiffs to be denied further hearing simply because they adopted the suggestion of that court, and agreed with defendant's contention therein, and dismissed suit in order that they might bring another in accordance with defendant's theory and in which they could have defendant placed more nearly in *statu quo*? The foregoing observations apply, it seems to me, to all three of the objections, above specified, to plaintiffs' recovery. But whether they do or not, plaintiffs ought not to be denied equitable relief on the ground of failure to act promptly. Upon discovery of the fraud, and learning for the first time of the existence of the certificate, they bring suit to cancel it without rescinding the old policy. So far as they know, the policy is not connected with or dependent upon the certificate at all. When they learn that defendant claims the certificate was a part of the consideration for the new policy, and that the evidence may tend to support that view from defendant's standpoint at least, they dismiss and institute another suit disaffirming the entire contract. Hence, they are not chargeable with failing to act promptly, nor with disaffirming the contract simply because in the first suit they did not ask to have the entire contract rescinded.

"The second ground of defendant's objection, noted above, that plaintiffs have not tendered before suit that which they have received under the new con-

tract, ignores the distinction between actions at law based on a rescission by act of the party, and a suit in equity to obtain a rescission. In the former he must tender to the opposite party all that he has received. In the latter it is not necessary to do this before suit, but it is sufficient if he offers to do so in his bill. [24 Am. and Eng. Ency. of Law (2 Ed.), page 621; Wheelan v. Reilly, 61 Mo. l. c. 569; Paquin v. Milliken, 163 Mo. l. c. 107.] The plaintiffs in this case ask for an annulment or rescission of the contract, and, as an incident thereto, pray for the cancellation of the certificate and new policy and a reinstatement of the old; and also with this prayer for cancellation, they present the new policy for the court to act thereon. It would seem that in equity this is all that is required.

"The third ground of defendant's objection to plaintiffs' recovery is that Green did not rescind *in toto*, but, after discovering the fraud, elected to stand by the exchange and to insist on his rights under the new policy by paying the premiums thereunder. It will be remembered that up to the dismissal of the first suit in January, 1909, the case was not a suit to rescind at all. Plaintiff Green knew nothing of the certificate at the time he accepted the new policy, nor did he accept it as based on the certificate or as having anything whatever to do with it. Hence, his first suit was not to rescind a contract, but to have the court declare that a certain instrument defendant was claiming to be an obligation of plaintiffs was, in fact, no contract at all and had never been entered into. When, however, the evidence is adduced, and it is seen that, from defendant's standpoint at least, the new policy was issued on the certificate as a part of the consideration and the two were therefore parts of the same transaction, plaintiffs dismiss the suit and ask that the entire new contract be annulled and the old reinstated. Consequently, until the dismissal of the first suit, plaintiffs were not required to relinquish their rights

under the new policy, since, so far as they knew, its force as a contractual obligation had nothing to do with the certificate of loan. They could in no wise be said to have elected to affirm the new policy, including the certificate of loan, until they were convinced that the new policy was founded upon and is a part of the certificate.

"But having discovered that the two are inseparably connected, and having brought this suit to set aside the entire new contract, will the payment thereafter of premiums called for in the new policy be such an affirmance and ratification of the policy and certificate as to preclude plaintiffs' recovery?

"On this point, it is well to remember the reason for the requirement that persons seeking a recission must rescind *in toto*. It is simply the maxim that 'he who seeks equity, must do equity,' and the reason the reason underlying this maxim is that the party must relinquish every benefit he has acquired under the contract he seeks to rescind in order that the parties may be placed in the same situation they were in before the obnoxious contract was entered into. Now, in what way are the plaintiffs refusing to do equity, or in what way are they refusing to give up any benefits they may have under the new policy? Certainly, since the institution of the new suit, they cannot be said to be claiming under it, since they are asking the court to cancel it. Can it be said that by paying the premiums under the new policy they are refusing to do equity or to put the opposite party in *statu quo?* The premiums under the new policy are more than twice those under the old. Can the defendant complain of plaintiffs' inequity because it receives from plaintiffs more than double the amount due under the contract which plaintiffs say should be reinstated? The paying of these increased premiums in not keeping back some of the benefits of the trade sought to be annulled. The show is on the other foot.

Instead of keeping back certain benefits, the plaintiffs are relinquishing to defendants benefits, which should not go to it if plaintiffs' contention be true.

"But defendant urges that plaintiffs have had the benefit of the increased insurance during the years that have elapsed since the issuance of the new policy, and, since they have had it, they should not be allowed, at this late day, to rescind the contract. It might be well to inquire what additional insurance the plaintiffs received under the new policy over that in the old? The premiums under the new are more than double those of the old. The face of the two policies are the same, to wit, $1000. There are certain guaranteed additions in the new policy, but, with the certificate of loan in force, they will be promptly absorbed by it, and if the insured lives beyond the premium paying term of the policy (which would give the defendant the benefit of the greatest number of premiums) these additions cease, and the policy drops back to the face again; and upon the death of the insured, this face is to be rduced by the amount of the certificate loan with einterest. It is true the amount of money payable on the old policy is conditioned on the same being realized from the mortuary payments or from the reserve fund. There is no evidence, however, that these funds were insufficient to pay the face of the policy either at the time it was exchanged or at any time during the years that have since elapsed. Hence, the advantage of the insurance under the new policy over that under the old is not established by reason of the provision in the old policy that the amount payable thereunder is dependent upon the funds on hand. If there is any additional insurance or increased benefit accruing to plaintiffs under the new policy over what they were entitled to under the old, the same is not readily apparent. Defendant's actuary, Mr. Dickenson, admitted on the stand that during the twenty year period (which has not yet elapsed) the

insurance to plaintiffs would amount to practically the same under the new policy as under the old. The court, however, is not an insurance expert, and there may be some additional benefits accruing under the new policy which the court has overlooked.

"But conceding that under the new policy plaintiffs have had the benefit of increased insurance, still, will that prevent their rescinding in this particular case? The reason for refusing a recission where one party has obtained a benefit he does not restore, is that the parties cannot be placed in the same situation they were in at the time the contract was made. But that reason does not exist here. The parties can be restored to the situation they formerly occupied. It is true that in the years elapsing since the exchange, defendant, by the death of Green, might have been called on to pay under the new policy, but, as a matter of fact, it hasn't; and the defendant's situation has not changed. But even if it has, whose fault is it? Certainly not the plaintiffs.' They did not secure the exchange of the policies. They were induced to accept the new policy without knowing the real consideration on which it was issued. This fact was fraudulently concealed from them by defendant's agent. In such cases, the rule is that where the impossibility of restoring the *status quo* results from the fraud of the defendant, without any fault on the part of the plaintiff, recission will be granted and justice done between the parties as near as circumstances will permit. [24 Am. and Eng. Ency. of Law (2 Ed.), page 623; Paquin v. Milliken, 163 Mo. l. c. 107.]

"In my opinion, therefore, it having been established that plaintiff Green was induced to exchange policies and to pay additional premiums through fraud practiced upon him without fault or negligence on his part, and there being nothing to prevent the parties being placed in *statu quo*, the plaintiffs are entitled to have the exchange of policies set aside, the

certificate of loan and new policy annulled, and the old policy reinstated.

"As to recovering the excess premiums paid up to and including October 17, 1908, there have been eleven premiums paid without knowledge of fraud, involving the integrity of the new policy. In each of these there was an excess payment of $10.52, aggregating the sum of $126.74. The interest on this excess sum amounts to $25.99, making in all, the sum of $152.73, together with two excess premiums paid since institution of suit, amounting to $21.04, aggregating $173.77, which plaintiffs are entitled to recover in addition to having the other relief above stated. Decree in accordance herewith is therefore ordered."

For the reasons stated by the learned circuit judge the judgment is affirmed. All concur.