246 S.W.2d 371 (1952)
RELIABLE LIFE INS. CO.
v.
BELL.
No. 28234.
St. Louis Court of Appeals, Missouri.
February 19, 1952.
Motion for Rehearing or for Transfer to Denied March 14, 1952.
*372 N. Murray Edwards, Ninian M. Edwards, St. Louis, for appellant.
*373 Jones, Hocker, Gladney & Grand, James C. Jones, Jr., St. Louis, for respondent.
Motion for Rehearing or for Transfer to Supreme Court Denied March 14, 1952.
ANDERSON, Judge.
This is a suit in equity brought by plaintiff, The Reliable Life Insurance Company, to cancel two policies of life insurance issued by said company to Owens Brown, now deceased, and to enjoin the prosecution of any suit at law or action in equity in any court to recover on said policies. The beneficiary in said policies, Mary Bell, was named as defendant. The trial court found the issues for plaintiff and granted the relief prayed. Defendant has appealed.
The applications for the policies are dated April 30, 1949, and both purport to be signed by "Ownes Brown". Each contained the following questions and answers, and agreement:
"22 a. What is the present condition of your health? Good.
"b. When last sick? Can't remember.
"d. Does any physical or mental defect or infirmity exist? No.
"26. Has life proposed ever suffered from Consumption, Asthma, Spitting of Blood, Habitual Cough, Apoplexy, Paralysis, Heart Disease, High Blood Pressure, Insanity, Fits or Convulsions, Rheumatism, Disease of the Liver or Kidneys, Cancer, Ulcers or Accident of any kind, or any chronic sickness? No.
"27. State what disease or accident and when last sick. None.
"28. Have you ever been confined in a hospital? If so, state for what disease, injury or observation, give date and how long confined? No.
"I Hereby Apply for insurance for the amount named herein, and I declare that the answers to the above questions are complete and true, and were written opposite the respective questions by me, or strictly in accordance with my directions. I agree that said answers, with this declaration, shall form the basis of a contract of insurance between me and The Reliable Life Insurance Company, and that the policy which may be granted by the Company in pursuance of this application shall be accepted subject to the conditions and agreements contained in such policy. I further agree that no obligation shall exist against said Company on account of this application, although I may have paid premiums thereon, unless said Company shall issue a policy in pursuance thereof, and the same is delivered to me while in sound health."
The two policies issued pursuant to these applications were both dated May 16, 1949, and each insured the life of Owens Brown in the amount of $500. Mary Bell was designated as beneficiary in each policy. The weekly premium provided for in each policy was the sum of 63 cents. Each policy contained the following sound health warranty: "This policy shall not take effect if the Insured die before the date hereof, or if on such date the Insured be not in sound health, but in either event the premiums paid hereon, if any, shall be returned."
Each policy contained an incontestability clause, as follows: "After two full years from its date, this policy shall be incontestable, except for non-payment of premium, or except as to provisions and conditions relating to Specific Disablement Benefits. * * *"
This suit was filed October 27, 1949, and was tried on an amended petition filed November 17, 1950. The said amended petition was in two counts, each count being directed to one of said policies. Each count alleged the making of the written application for the policy in question, by the insured, the representation concerning his health given in answer to the questions contained in said application, which questions and answers we have heretofore set out, and the issuance of the policy and its terms, including the sound health warranty hereinbefore mentioned. Each count then contained the following allegation: "5. The representations of the said Owens Brown in his application for said policy as aforesaid was false, fraudulent and untrue in this, that the said Owens Brown, at and prior to his application for said policy and at the time of the issuance and delivery of said policy, was afflicted with a disease of the heart, blood vessels and kidneys, for which he had consulted a physician or physicians on numerous occasions prior to his *374 application for said policy, and for and on account of which he had previously been confined to a hospital, and that the ailments and diseases with which the said Owens Brown was afflicted at and prior to his application and when said policy was issued and delivered to him caused and contributed to his death, which occurred on August 6, 1949."
Each count pleaded the incontestable clause, hereinbefore set out, and averred that no action or suit had been instituted by the defendant to recover on said policies. A tender into court of the premiums paid for said policies was averred. The prayer of each count of said petition was that the court "set aside and annul said policy * * that defendant, Mary Bell, be enjoined and restrained from instituting or prosecuting during the pendency of this suit and thereafter any action of law or suit in equity in any court against the plaintiff to recover on said policy; and also for such other and further relief as to the court shall seem meet and just."
On November 22, 1949, Mary Bell brought suit on said policies in the Circuit Court of the City of St. Louis. Thereafter, on motion of plaintiff herein, the court issued a temporary injunction enjoining defendant herein from further prosecuting said suits at law on the said policies until final disposition of the instant suit.
Defendant herein filed an answer in this cause in which she admitted that Owens Brown made application to plaintiff for the insurance, but denied that he signed written applications in which he made the representations as to his health as alleged in plaintiff's petition. Said answer also admitted the issuance and delivery of said policies.
Defendant, by said answer, denied that either policy contained a provision that it would not take effect if the insured was not in sound health on the date thereof; denied the allegations of the petition wherein it was alleged that said Owens Brown made false and fraudulent statements with respect to his health; denied that the policies contained an incontestable clause; and denied that plaintiff had tendered into court the amount of premiums paid.
It was further alleged that after the death of the insured defendant and her attorney carried on negotiations with plaintiff in an attempt to collect said insurance; that while doing so plaintiff, suddenly and without notice to defendant, filed this suit; that thereafter defendant filed suit against plaintiff for recovery of the amount due her with interest, attorney's fee and penalties for vexatious refusal to pay on the part of plaintiff; that said suit was filed in the Circuit Court of the City of St. Louis, Missouri; that said case was at issue and set for trial April 24, 1950, and that she was entitled to try the issues in said suit before a jury.
It was further alleged that plaintiff had an adequate remedy at law in the defense of said suit filed by defendant, and that plaintiff had in its answer to said suit set up the defense of fraud asserted in its petition in the instant suit.
It was further alleged that the defendant was entitled to a trial by jury on all the issues; that the court had no jurisdiction over the person or subject matter of the action; and that the petition failed to state facts sufficient to constitute a cause of action against defendant.
Said answer contained a prayer for relief, praying that the court dissolve the restraining order and injunction theretofore issued against defendant; that the court dismiss plaintiff's petition and allow defendant damages by reason of the injunction, plus interest, penalties, reasonable attorney's fee, and costs, and such other relief as the court should deem meet and proper.
The court, sitting as a chancellor, heard evidence on all issues presented by the pleadings except the issue as to whether the matter alleged to have been misrepresented actually contributed to Brown's death. Those issues tried to the court were found in favor of plaintiff. The issue of contribution was then submitted to the jury upon the following interrogatory:
"Did heart disease, from which Owens Brown was suffering on April 30, 1949, and on May 16, 1949, and for which he had been treated in the Homer Phillips Clinic and *375 the Homer Phillips Hospital in 1947, 1948 and 1949, actually contribute to the death of the insured, Owens Brown?
"Answer `yes' or `no'.
"Answer: ______"
The jury answered said interrogatory in the affirmative.
The court then adopted this finding of the jury and incorporated same in its finding of fact, and entered judgment canceling said policies and making permanent the temporary injunction theretofore issued.
Appellant contends that the trial court erred in overruling her motion to dismiss and in entering judgment for plaintiff because the facts in the petition pleaded and uncovered at the trial show that appellant has an adequate remedy at law by way of defense to a suit on the policies. This contention is clearly without merit. New York Life Ins. Co. v. Feinberg, 357 Mo. 1044, 212 S.W.2d 574; New York Life Ins. Co. v. Cobb, 219 Mo.App. 609, 282 S.W. 494.
Appellant further contends that respondent is precluded from invoking any misrepresentation made by the insured in his application as grounds for cancellation because it failed to deposit into court at or before the trial all premiums collected on the policies. In making this contention appellant relies upon the provisions of RSMo § 376.610, V.A.M.S., and makes the point that no proper deposit was made because it was by check and not in legal tender.
It appears from the transcript that the policies were issued under date of May 16, 1949, and that each policy provides for a weekly premium of sixty-three cents. Twelve weeks intervened between the date of the issuance of the policies and the insured's death on August 6, 1949. The premium receipt book, a copy of which was introduced in evidence by appellant, records the payment of thirteen weekly premiums on both policies in the aggregate sum of $16.38.
On November 17, 1950, the plaintiff secured leave of court to deposit into the registry of the court the sum of $17 as a return of the premiums to defendant. On the same day, plaintiff delivered to the cashier in the office of the circuit clerk a check, dated November 16, 1950, in the amount of $17, payable to Phelim O'Toole, Clerk, drawn on the account of Jones, Hocker, Gladney and Grand, and signed by Edward W. Lake and Frank Y. Gladney. The firm of Jones, Hocker, Gladney and Grand were attorneys for plaintiff in this case. This check was cashed by the circuit clerk on November 28, 1950, five days after the conclusion of the trial and entry of judgment. Appellant's motion for new trial was filed November 30, 1950, and in said motion appellant for the first time complained that the deposit was by check instead of in legal tender, and that there was no cash on deposit with the clerk at or before the trial.
At the time the motion was filed there was on deposit with the clerk for the benefit of defendant a cash sum in excess of the amount which defendant had paid as premiums on said policies. Defendant did not choose to accept the decree and draw down the deposit, but, in her motion, urged that the decree should have been for defendant for reasons other than that no legal tender had been made.
Our Supreme Court, in New York Life Ins. Co. v. Feinberg, 357 Mo. 1044, 212 S.W.2d 574, has expressly held that Section 376.610, supra, by its very terms, relates only to actions at law and not to suits brought in equity to cancel policies for fraud. Therefore, respondent was not by this statute required to tender a return of the premiums to appellant by making a deposit into court on or before the trial. See also, State ex rel. National Council of Knights and Ladies of Security v. Trimble, 292 Mo. 371, 239 S.W. 467.
In the absence of a statute, an insurance company is not required to return or tender back the premiums received as a condition precedent to bringing a suit in equity to cancel a policy on the ground of fraud, though the court may require such tender as a condition to the entry of its decree. Nor is a deposit in court of the premiums paid a condition precedent to maintaining the suit. See 12 C.J.S., Cancellation *376 of Instruments, § 43, p. 1003, which announces the rule, as follows: "Whatever may be the rule at law on the subject, it is not essential to deposit in court the thing or the amount necessary to place defendant in statu quo, since the court is authorized under the prayer for general relief to dispose of the whole case on equitable terms, whether the amount is deposited in court or not."
The above rule is applicable to suits for the cancellation of insurance policies. 12 C.J.S., Cancellation of Instruments, § 44, p. 1013.
The rule applicable is also stated in Black on Rescission and Cancellation (2d Ed.) sec. 625, page 1514, as follows: "* * * On the other hand, he may choose, or he may find it necessary (as, for instance, where he seeks the cancellation of a written instrument) to bring an action for the direct and specific purpose of obtaining a rescission by decree of court. If he takes the latter course, it is not a condition precedent to his right to maintain the action that he should have offered a restoration of what he may have received under the contract, before suit brought, but it is sufficient if he offers in his complaint or bill to make such restoration or otherwise to put the defendant in statu quo. For as such a suit is necessarily an equitable proceeding, the court has power to adjust the equities of the parties and to impose such terms on the complainant as may be equitable; * * * In other words, an offer to return the consideration of a contract or instrument sought to be vacated for fraud or other such cause is not a condition precedent to the institution of a suit for that direct purpose, but is a condition upon the granting of the relief demanded."
See Robison v. Floesch Const. Co., 291 Mo. 34, 236 S.W. 332, 20 A.L.R. 1239; Green v. Security Mutual Life Ins. Co., 159 Mo.App. 277, 140 S.W. 325; Butler County v. Campbell, 353 Mo. 413, 182 S.W.2d 589; and Modern Woodmen of America v. Angle, 127 Mo.App. 94, loc. cit. 117, 104 S.W. 297.
Under the foregoing rule, plaintiff in this case was not required to deposit the premiums as a condition precedent to maintaining the suit. Plaintiff's only obligation was to offer to do equity; to offer to restore defendant as far as possible to the position she occupied before the policies were taken out.
Plaintiff in its petition tendered to defendant the full amount of the premiums collected on the policies, although defendant alone had not made all the payments, and notwithstanding the fact that by reason of the misrepresentation statute, RSMo § 376.580, V.A.M.S., plaintiff had actually insured the life of Owens Brown during the twelve weeks' period, except for death from disease from which he was suffering at the time of making application for the policies. This tender was a sufficient offer to do equity as a condition to the relief sought. Modern Woodmen of America v. Angle, 127 Mo.App. 94, loc. cit. 117, 104 S.W. 297; Green v. Security Mutual Life Ins. Co., 159 Mo.App. 277, 140 S.W. 325. But plaintiff did more than merely offer to return said premiums. Prior to the trial plaintiff deposited with the clerk a check for more than the amount of the premiums paid, which check the clerk accepted and converted into cash before the judgment became final. We fail to see how defendant could have been prejudiced by the fact that the clerk did not insist on a cash deposit. In our opinion, plaintiff complied with the rule that, "he who seeks equity must do equity."
But it is urged that the deposit made by plaintiff was not in sufficient amount. As heretofore stated, the premium receipt book, a copy of which was offered in evidence by appellant, showed thirteen payments of $1.26, or a total of $16.38. There was also offered in evidence by appellant a receipt dated March 9, 1949, signed by the plaintiff's agent, Cornet, which showed on its face: "receipt for $1.00 from Owens Brown." There was nothing on this receipt stating that the one dollar was given on account of the premiums on the policies subsequently applied for and issued. Both policies contained the provision that, "all premiums are payable at the home office of the Company, but may be paid to an *377 authorized representative of the company; such payments to be recognized by the company must be entered at the time of payment in the premium receipt book belonging to this policy." Appellant contends that in ascertaining the total amount of premiums paid, the $1 shown by the receipt of March 9, 1949, should be added to the amount shown in the premium receipt book, thus making a total sum of $17.38 collected as premiums on the two policies. We have carefully examined and considered the evidence bearing on the question and have concluded that the most reasonable inference to be drawn therefrom is that the $1 shown to have been collected by agent Cornet was accounted for and included as a part of the premiums entered in the premium receipt book. We so find.
Appellant next contends that the finding of the trial court that Owens Brown signed the applications upon which the policies in question were issued is erroneous and not supported by the evidence.
To establish the misrepresentations pleaded, plaintiff relied upon the testimony of John Cornet and William Edward Wallis. Cornet was the plaintiff's soliciting agent, and Wallis was a superintendent under whom Cornet worked. It appears from the testimony of these witnesses that both were present when the policies were solicited and the applications taken, and while neither had a very clear independent recollection of the event, the testimony which they gave was, in our opinion, sufficient to warrant a finding that the insured did make the statements contained in the applications and that he signed same in their presence. Witness Wallis identified his signature witnessing the signature of Owens Brown, and testified that he would not have signed his name as a witness to Brown's signature unless he had at the time actually seen the latter sign the application. Wallis also testified that he asked the insured questions and that Cornet wrote the answers into the applications. On cross-examination, he admitted that he could not recall word for word the questions asked, and did not recall any of the conversation which took place at the time. Cornet gave like testimony. The defendant, Mary Bell, testified that the signature "Ownes Brown", which appears on each application, was not the signature of the insured. From this testimony, and the other evidence which she produced, it might reasonably have been found that the insured did not sign the applications or make the alleged misrepresentation. The trial judge did not choose to believe defendant's evidence. We have carefully examined the entire evidence on this question and have reached the conclusion that the trial court correctly found in favor of plaintiff on this issue.
Appellant next complains that the finding of the trial court that the insured had heart disease when he applied for the insurance was not supported by the evidence.
On this issue, the plaintiff offered in evidence a record of the Homer Phillips Hospital. Dr. Robert J. Glaser, testifying from that record, gave the following testimony as to its contents:
"This record of Charles Brown on December 1, 1948, indicates that the patient was examined and the findings of that examination indicated a gallop rhythm and signs of heart failure. Those are objective findings which one discerns with a stethoscope. They are indicative of heart failure. * * * He was seen repeatedly, with the similar findings. * * * There is a report of an X-ray film, which we call an objective finding relied on by physicians, the interpretation of which is standard according to certain principles laid down in medicine. The interpretation here, or the report, rather, of the X-ray film indicated an enlarged heart and pulmonary congestion. Enlarged heart is indicative of heart disease. Pulmonary congestion means signs of fluid in the chest, which is a sign of heart failure. That was on December 31, 1948. * * * On December 31st he was examined by the same examiner and again on physical examination had rales, which are signs of moisture in the lung, just as the X-ray shows congestion. When one listens with the stethoscope, he hears noises, which are called rales, and indicate congestion due to heart *378 failure. His blood pressure at that time, taken with the blood pressure cuff, was definitely elevated. * * * A gallop rhythm is a sign which one discerns with the stethoscope and it sounds just as the name indicates; it sounds like a horse gallop; and normally the heart has two sounds which you probably heard described as love, dove; and when the heart fails or serious damage affects the heart, the so called gallop rhythm appears, which is quite characteristic, and it sounds like a horse gallop. That is the sign that is described here. * * *
"Q. How many times was he seen at the clinic, Doctor? A. He was seen in 1947; the six times should be '47; then January 7, 1948, and August 18, 1948; and all the entries in here, without going through each one individually, are consistent with the same disease process.
* * *
"Q. Doctor, I will now show you the Plaintiff's Exhibit 8, which has been identified as the Hospital records of the Homer Phillips Hospital, and ask you if you will please tell the jury what they show with reference to the condition of the patient.
* * * A. There are here four hospital records of the patient whose name on these is Charlie Brown or Charles Brown. He was in the hospital as an in-patient. The first of these, he entered on December 23, 1948. * * * His blood pressure on that occasion, at the time of entry, was 164 over 120. The upper limit of normal for a patient of this age would be between 140 and 150 over 90. The lower figure of the two is the more important in regard to the condition as regards high blood pressure. The upper reading is much more variable. * * * Well, a blood pressure of this value, 164 over 120, is definitely abnormal. * * * Again trying to stick to objective evidence, the X-ray film taken at that time, 12/23/48, showed enlargement of the heart, and also of the aorta, which is the main blood vessel coming off the heart. Again, pulmonary congestion, evidence of fluid in the lungs, which was found in the report I read you from the clinic record.
"Q. Doctor, with regard to the enlargement of the heart and enlargement of the aorta, what does that indicate with reference to the physical condition, the medical condition of the patient? A. Of course, they are unfavorable signs taken with the blood pressure readings, they are indicative of rather severe cardiovascular disease, disease of the heart and blood vessels. To go on, * * * he was admitted 12/23/48 * * * stayed for a few days, was discharged and readmitted 1/6/49, with his chief complaint, in his words, `I am short of breath'. On that occasion his blood pressure was 160 over 100. His respiratory rate, which is an objective measurement, counted at bedside, was 30, which bears out his subjective symptom of being short of breath. No X-ray was taken, as far as I can see, at that time. He then re-entered in March of `49 * * * March 7, 1949, at 12:30 p. m. and at that time his blood pressure on two arms, one on each arm, was 150 over 120. Another chest film was taken at that time and showedI quote the report, `There is no essential change since the last examination.' In other words, there was still cardiac enlargement and pulmonary congestion, and this history, this sequence of events is perfectly classical for people who have recurrent chronic heart failure. * * * The last Homer Phillips admission was March 30, 1949. Blood pressure here is 150 over 125. * * * That is grossly abnormal on the basis of what we know about this man's pressures over a period of time. That's a very serious elevation of the diastolic pressure.

* * * * * *
"Q. Does your whole Homer Phillips record, when you take all these tests into consideration, do they indicate a disease or ailment this man was suffering? A. Certainly. There was hypertensive cardiovascular disease, which means disease of the heart, and blood pressure rising as a concomitant syndrome. On the basis of high blood pressure, if the blood pressure readings were the only things we had and the heart size was normal, one would not be able to make the diagnosis like that. That's why I insist on taking the picture as a whole.
*379 "Q. Is hypertensive cardiovascular disease commonly thought of as heart disease? A. Sure."
The evidence further shows that insured entered Barnes Hospital for treatment on June 6, 1949. Dr. Glaser, testifying from the Barnes Hospital record, stated:
"* * * Two years before entry he was given an easier job because the doctor told him he had heart trouble, a little heart trouble. * * * He got along well until ten months before entry, which was sometime in 1948 presumably, when he began to have exertional dyspnea. That means short of breath when one does something. That exertional dyspnea rapidly increased in severity so minor exertion caused him to become dyspneic. Seven months before entry, which would have placed it about November or perhaps December, 1948, his exertional dyspnea had become very much worse. At that time he noticed paroxysmal nocturnal dyspnea. By way of explanation, that's a form of shortness of breath which is seen often in advanced heart disease, in which a patient, while sleeping, suddenly wakes up and is unable to breathe, goes to the window and tries to get some breath. And then apparently these symptoms all became worse and his appetite became poor; he lost seventy pounds in ten months. * * * His blood pressure by * * * one physician on entering was 130 over 115, by another 135 over 100, and on physical examination the findings which pertain here, in addition to the fact that he looked seriously ill and quite uncomfortablehe was short of breath; his neck veins were fullthat is an indication of cardiac failureand he exhibited a marked wasting, which is, of course, compatible with his weight loss of 70 pounds. His heart was markedly enlarged to the anterior axillary line; that's the line beginning in the area under the shoulder. * * * In the lungs cracking rales were heard, which is a sign of moisture in the lungs. His liver was markedly enlarged; * * * the liver may become enlarged in heart failure and may eventually go on to cirrhosis. * * * That's a complication of heart failure. Now, there are distinct further evidences of heart failure upon various technical procedures, the determination of the venous pressure, which bore out the report of the neck veins being distended; there are many electrocardiograms here which were all abnormal, there were apparently six or eight of those. The heart on X-ray was enlarged to both the right and left. There was again evidence of pulmonary congestion, such as was noted * * * on the Homer Phillips' record; and he was treated for heart failure, given the usual medical management, which is restriction of salt and the use of digitalis; which is a substance which aids the heart. He was kept at bed rest and during the course of his hospital stay he lost weight in the form of water which he had accumulated as a result of his heart failure. He was discharged and was supposed to follow a very restricted diet at far as salt was concerned, and to take two digitalis pills daily. The final diagnosis was hypertensive cardiovascular disease, cardiac insufficiency. Those were the primary diagnoses. Secondary diagnosis: suspected anxiety hysteria. * * * Then he was re-admitted for the last time, having been discharged on July 16th, on July 25th, and he had again the signs and symptoms which suggest that his heart failure, which obviously had not been completely controlled at the time of his discharge, had recurred * * * had gotten worse so that he was in great distress. * * * he had heart failure arising on the basis of hypertensive cardiovascular disease. * * * At the time of his second admission he had developed numerous complications which indicated rather serious disease; for example he developed auricular fibrillation, which means total irregularity of the heart, instead of irregular rhythm; it was going totally irregular; the upper and lower chambers were not contracting together. That is seen not only in hypertensive cardiovascular disease but other forms of heart disease as well. * * * His pulse at the wrist was about 70 to 80 as opposed to 140 at the heart, which gives you some indication of how many times the heart *380 was contracting without enough force to even make itself felt at the wrist.

* * * * * *
"At the time of the autopsy * * * his heart is described as hypertrophied and dilated; dilated means it's larger than normal. Hypertrophy is much more important as an indication of long standing disease, * * * his heart weighed 750 grams; the normal weight of the heart in a male this size would probably be under 400 grams
* * *. In addition, there was rather widespread arteriosclerosis involving the blood vessels of the kidney, the adrenal glands, pancreas, the aorta, the coronary blood vessels * * * and there was advanced chronic passive congestion of the liver, which explains the large liver, and is complication of long standing heart failure. * * * so this man at autopsy had findings compatible with long standing heart disease and disease of the blood vessels. * * *
"Q. Now, doctor, * * * is the condition of that man, as shown in those Barnes Hospital records, consistent with the condition that was found in the same man in the Homer Phillips Hospital records? * * * A. It's quite what one would expect in the course of the natural history of this particular disease; it's quite characteristic. * * * He had chronic heart failure throughout the whole course.

* * * * * *
"Q. Now, doctor, assuming that Plaintiff's Exhibit 7, which are the clinic records of the Homer Phillips Hospital, and the Plaintiff's Exhibit 8, which is the hospital records of the Homer Phillips Hospital, and Plaintiff's Exhibit 9, which is the hospital record of the Barnes Hospital, pertain to the same patient, do you have an opinion, based upon the examination of those records, as to whether or not such patient was suffering from the disease on April 30, 1949? * * * A. In my opinion, there would be no question about it, on the basis of the weight of the heart alone at the time of the post mortem examination. From known observations in experimental laboratories, the time it takes for a heart to increase that much in size, in weight, in actual increase in mass, would be a matter of months, so that certainly on the basis of these records, in my opinion, this patient had this disease on April 30th. * * *
"Q. Would your answer, same answer, apply to May 16, 1949? A. Certainly. * * *"
The witness further testified that this disease from which the patient was suffering on April 30, 1949, and May 16, 1949, did contribute to cause the death of said patient.
In our opinion, the foregoing evidence, based upon hospital records, conclusively proves that insured was suffering from heart disease on April 30, 1949, and on May 16, 1949, and that he subsequently died of heart disease.
Appellant complains of the giving of Instruction No. 1. Said instruction is as follows:
"The Court finds as a fact that Charles Brown, Charlie Brown, Charles Owens Brown, Charlie Owens, Brown and Owens Brown (hereinafter referred to as Owens Brown) were one and the same person and was the same person who is insured under the policies in suit issued by the plaintiff, and the Court therefore instructs you that there is no question for you to determine as to the identity of the person in question.
"The Court further finds from the evidence that on April 30, 1949, and on May 16, 1949, the insured, Owens Brown, was suffering from heart disease for which he had been treated in the Homer Phillips Clinic and the Homer Phillips Hospital in 1947, 1948, and 1949. The only question for you to determine is whether or not this heart disease actually contributed to the death of the insured on August 6, 1949.
"In this connection the question is not whether the insured knew that he was suffering from heart disease, as that is a matter with which the jury is not concerned, nor is the question whether heart disease was the sole and only cause of the insured's death, but the question is whether or not heart disease was one of the causes of death and whether or not heart disease actually contributed to the death.
*381 "Therefore the court submits to you the following interrogatory which is to be answered by you in the light of this instruction:
"Did heart disease from which the insured, Owens Brown, was suffering on April 30, 1949, and on May 16, 1949, and for which he had been treated in the Homer Phillips Clinic and the Homer Phillips Hospital in 1947, 1948 and 1949, actually contribute to the death of the insured, Owens Brown, on August 6, 1949?
"If, therefore, you find that such heart disease actually contributed to the death of the insured, Owens Brown, your answer to the interrogatory must be `Yes'."
Appellant's first complaint in said assignment of error with respect to said instruction is that the facts detailed therein as having been found by the court were not supported by any evidence. Said assignment is not carried forward and developed in the brief. Under such circumstances, the point will be deemed waived. Hanser v. Lerner, Mo.App., 153 S.W.2d 806; Porter v. Fickenwirth, Mo.App., 217 S.W.2d 738.
The next complaint is that by this instruction the court improperly deprived the defendant of a jury trial on all the issues in the case. There is no merit to this contention. Under New York Life Ins. Co. v. Feinberg, supra, the only issue for the jury was the issue actually submitted by said instruction, namely, did heart disease contribute to the death of the insured.
Appellant's final assignment of error is that the court erred in not permitting her counsel to comment upon the fact that one of the objects of the instant suit was to restrain the prosecution of the suit at law brought by appellant upon the two policies in question. The court, in sustaining the objection to this argument, stated:
"I will sustain that objection. Ladies and gentlemen of the jury, I instruct you now to disregard that argument. The question of whether or not that suit will be restrained or unrestrained is not for you. I, as a court, have to decide that question. Follow rigidly and closely the written instructions, which are now in the hands of either or both of the attorneys if they want to use them, as to the only matter that I can permit you to pass upon for me; the remainder of it, I, as a court, must rule upon. * * *
"Mr. Edwards: I object. I except to the court's remarks and to the court's oral instruction to this jury, which is improper and prejudicial to my client. I ask that the jury be discharged on account of the court's remarks to the jury on this question and his oral instruction to the jury as to what to do on this case; it's highly improper under our law. I make that motion at this time.
"The Court: That request is denied, and I instruct you, Mr. Edwards, to stay within the scope of the issues that are outlined by the instructions in the case, to the jury in this cause."
It is apparent that the remarks of appellant's counsel were not germane to the issue being tried before the jury, and that the court's action in sustaining the plaintiff's objection to the argument was proper. Plaintiff was acting within its legal rights in bringing this suit to cancel the policies and to enjoin the prosecution of the defendant's action at law, and no unfavorable comment should have been allowed on account of plaintiff having availed itself of that right.
The complaint that the court erred in orally instructing the jury to disregard said argument is without merit. RSMo § 510.300, V.A.M.S., which requires that instructions shall be in writing, is applicable only to instructions which submit to the jury the issues being tried. Barber v. American Car & Foundry Co., Mo. App., 14 S.W.2d 478.
The judgment appealed from is affirmed.
BENNICK, P. J., and GREEN, J., concur.