St. Louis Union Trust Company, Trustee, et al., Appellants, v. Adolphus Busch III, and August A. Busch, Jr., Executors under the Will of August A. Busch, Jr., et al.—145 S. W. (2d) 426.

Division One, December 11, 1940.

*Isaac C. Orr* for St. Louis Union Trust Company, Trustee; *Emmet T. Carter, James E. Garstang* and *Harold R. Small* for Edward Magnus et al.; *Carter & Small* of counsel.

*Ethan A. H. Shepley* and *Harry W. Kroeger* for respondents.

BRADLEY, C.—This cause is to determine the ownership of 1330 shares of stock in the Manufacturers' Railway Company in St. Louis. The respective claimants are the trustees of the trust estate created

by the will of Adolphus Busch, and a part of the beneficiaries on the one hand, and the August A. Busch estate on the other hand. The trial court found for defendants, that is, that Adolphus Busch gave the stock to his son, August A. Busch, and that it was owned by the August A. Busch estate. Motion for a new trial was overruled, and plaintiffs appealed.

The cause was filed by the St. Louis Union Trust Company and Charles Nagel as trustees of the trust estate, but Mr. Nagel died after the appeal was taken. Adolphus Busch, the alleged donor, died testate October 10, 1913, and August A. Busch, the alleged donee, died testate February 13, 1934. This cause was filed April 24, 1937. It is not necessary to deal with the pleadings or to set out by name those who are appellants and respondents. It is sufficient to say that those who contend that the stock belongs to the trust estate are appellants and all other parties are respondents, and we shall refer to the respective claimants as plaintiffs and defendants.

Plaintiffs, appellants here, contend that the evidence is not sufficient to support a gift *inter vivos*, and that, in any event, defendants' claim of such gift is barred by limitation, by laches, and by estoppel.

The Manufacturers' Railway Company was organized in 1887, and, in the beginning, was merely a switch track serving the Anheuser-Busch Brewing Association. Adolphus Busch, from time to time, furnished money to the railway company, and the son, August A. Busch, devoted much of his time to the development of the railroad, and sometime prior to 1903, August visioned the development of the railroad into a terminal system to serve not only the Busch brewery, but other industries in South St. Louis, and such vision was finally realized, and was largely due to the efforts of August A. Busch. In a letter to his son, August, written in Germany, and dated July 31, 1911, Adolphus, speaking of the railroad, said:

"The cost of our terminal system will be very heavy. We shall have to pay big sums for real estate wherever we branch out; we shall have to have railroad guards on every cross street to avoid accidents and damages. Our general administration will be a costly one, our taxation will be high, and unless we get fair earnings it will be difficult to make the two ends meet. . . . Now, I am really a terminal enthusiast. I mean to say by that that I shall give you my full support in carrying out your railroad scheme, which you have led very intelligently so far and with untiring perseverence. . . . Naturally, Gussie, of that which we get I am going to give you a fair share, to which you are undoubtedly entitled. I want to make you satisfied and happy so your further zeal is animated and not diminished."

At the time the letter was written there were 250 shares of the railroad stock issued. Adolphus held 200 of these, and August held 38, and 12 were held by others. April 8, 1912, the railway company

declared a stock dividend of 1000 shares, and when proportionately distributed, Adolphus held 1000 shares, and August 190. April 30, 1912, the capital stock of the railway company was increased to 10,000 shares, per value of each $100. At that time the company, for money advanced from time to time, owed Adolphus some $900,000, evidenced by promissory notes. It was arranged that 8330 shares of the new stock would be issued to Adolphus for $833,000 credit on the railway company's notes. September 24, 1912, the new stock was issued, but instead of issuing 8330 shares to Adolphus, only 7000 shares were issued to him, and 1330 shares were issued to August. The 7000 shares were evidenced by stock certificate No. 53, and the 1330 shares were evidenced by stock certificate No. 54.

Otto H. Rassfeld, a witness for defendants, testified that he was secretary and treasurer of the Manufacturers' Railway Company from 1895 until 1920, and that after the increase of the capital stock to 10,000 shares, and just prior to a trip to Germany by Adolphus Busch, that Adolphus sent for him, and told him "the manner in which he wanted those 8300 (8330) shares divided. That was, he (Adolphus) was to get 7000 shares and 1330 shares were to be given to his son;" that Adolphus told him (before he, Adolphus, left for Europe) to deliver to August A., certificate No. 54 "With his compliments for his (August's) endeavors and activities in connection with the Manufacturers' Railroad," and that he (Rassfeld) issued certificate No. 54, and delivered it to August A. Busch, and that August A. Busch "signed for it in the stock certificate book."

On the books of the Manufacturers' Railway Company, the 1330 shares, since the date of issue, have been in the name of August A. Busch, and were, until his death, voted by him, or by his proxy, and since his death, have been voted by his executors. No dividend was paid on this stock prior to the death of August A. Busch, and the dividends paid since his death have been deposited by his executors "in a separate bank account and are held subject to the final termination of this litigation."

The offices of both Adolphus and August A. Busch were in the office building at the brewery, on the same floor and directly across a hall from each other, and, prior to the death of Adolphus, August had no safe in his office, and "when documents or papers or things of value came to him at Anheuser-Busch, prior to his father's death, August Busch would invariably ask some one with safe facilities to keep them for him; he frequently made such requests of Miss Berg, Adolphus Busch's secretary." Lilly Busch, widow of Adolphus, Edward A. Faust, a son-in-law, and Charles Nagel, an attorney, were the executors named in the will of Adolphus Busch. Daniel N. Kirby, of Nagel & Kirby, counsel for the executors, testified that "Adolphus Busch had one or more safes in his office in the room occupied by him as president of the Anheuser-Busch Brewery Associa-

tion; following his (Adolphus') death Mr. Decker (associate counsel) and I had access to them and availed ourselves of that access in examining the contents of the safes in preparing the inventory, and Mr. Decker and I proceeded on the assumption that everything found in that safe belonged to Adolphus Busch; there were stock certificates in either or both of those safes of Adolphus Busch, standing in the name or issued in the name of August A. Busch, and if these certificates were already endorsed by August A. Busch, we assumed that they, being in Adolphus Busch's safe, were part of his estate; if they were not endorsed by August A. Busch, either Mr. Decker or myself had them endorsed by him; in such instances neither Mr. Decker nor I, to my knowledge, ever discussed with August A. Busch whether or not any of the stock represented by those certificates in his name was actually beneficially owned by him.''

The Adolphus Busch inventory did not show in whose name any of the railway stock, listed as assets of the estate, stood on the books of the railway company. The executors turned over the railway stock, with various other properties, to the trustees of the trust estate, and the trustees (one of whom was August A. Busch) receipted (May 11, 1914) therefor, but the receipt merely gave the number of shares.

The trust estate ''was large in terms of the number of items and the number of different securities,'' and the trustees employed (1914) George A. H. Mills as manager of the trust estate, and this estate was, for practical purposes, in the possession of Mills until the death of August A. Busch, February 13, 1934. Mills testified that he ''never knew of the trustees at any time personally making an inspection or an inventory of the various securities in the (trust) estate; to the best of my knowledge August Busch did not at any time ever see said certificate No. 54 between the time that I took charge in 1914 and the time when he made his claim (of ownership) in (1932) 1933.''

In May, 1932, August A. Busch ascertained that certificate No. 54 was being carried as an asset of the trust estate, and he thereupon asserted his ownership to Mr. Nagel, his cotrustee, and requested that Mr. Nagel have the 1330 shares of stock turned over to him. Mr. Nagel suggested that August take the matter up with the beneficiaries of the trust estate and get their consent, and August wrote his sisters (in Germany), but got no response. Also, at August's request, Mr. Kirby wrote others concerned. Adolphus Busch's books, kept by Miss Berg, under date of December 31, 1912, shows cancellation of ''a like amount'' of the railway company's notes and receipt of 8330 shares of the stock, and this stock is listed as certificate No. 53 for 7,000 shares, and certificate No. 54 for 1330 shares. In the column next after the entry of certificate No. 54 for 1330 shares, is ''Aug. A. B.'' And it was shown that at a meeting of the stockholders

of the railway company, April 1, 1913, both Adolphus and August A. Busch were present and Adolphus voted 7965 shares and August 1505.

Gustave A. Stamm, from the latter part of 1914, to latter part of 1918, kept the books of August A. Busch, and in the books opened January 1, 1916, he showed August as owner of 1520 shares of stock in the railway company. These included the 1330 shares and the 190 shares previously owned. Rudolph Huber followed Stamm as bookkeeper for August, and was such until August's death. Huber did not show the 1330 shares as being owned by August. He made up the lists of stock owned by August by actual examination of stock certificates in August's individual possession.

The trial court, in the decree, found, among other findings, as follows:

"9. That after the death of Adolphus Busch it was assumed by members of the law firm which represented the executors of the will of Adolphus Busch, and who prepared the inventory of his estate, that everything contained in his safe, including endorsed in blank and unendorsed stock certificates standing in the name of August A. Busch, belonged to the estate of Adolphus Busch.

"10. That no discussion or consultation was had by and between the attorneys for the said executors and August A. Busch as to whether any of the stock found in his father's safe, represented by certificates standing in his name, were beneficially owned by him. Proceeding on the assumption that all such stocks, including those shares of stock represented by certificate No. 54, belonged to the estate, they represented to him that all unendorsed certificates standing in his name belonged to his father's estate and thus procured his signature in blank to all certificates, including certificate No. 54, without any examination or investigation being made by him as to the correctness of the representations. Certificate No. 54, in the name of August A. Busch, for the 1330 shares of capital stock of Manufacturers' Railway Company, therefore, was included in the inventory of the estate of Adolphus Busch, but said inventory, which consisted of numerous items, did not on its face indicate or disclose that the stock represented by said certificate stood in the name of August A. Busch."

As stated, supra, certificate No. 54 was in the safe of Adolphus Busch at the time of his death, and was listed as an asset in the inventory of his estate, and it appears that, at least, from the time the certificate was so listed it bore the endorsement in blank of August A. Busch. In the letter to his sisters, August A. Busch, among other things, said: "Quite recently, I learned that, by some mistake, the certificate for these 1330 shares was included in the inventory of father's estate. This inventory was prepared by Mr. G. F. Decker, since deceased, who was then a member of the firm, Nagel & Kirby,

and was assigned by Mr. Kirby to do the details of that work. The inventory was a very voluminous document and the list of stocks alone covered about seventeen typed pages, listing shares in about one hundred different corporations. As to many of these companies, for instance, our branch companies and our ice and cold storage companies, father had caused a small number in each case of his shares to be issued in my name to qualify me as a director, so that when Mr. Decker was making up the lists of securities to be included in the inventory, he found many stock certificates for such shares standing in my name, and I was asked to assign them in blank so that they could go into the inventory. I assumed that the correct certificates were placed before me for endorsement, and I endorsed those placed before me without examining the face of the certificates. Evidently the certificate for these 1330 shares of stock in the railway were among the certificates which I endorsed under these circumstances, and the endorsed certificate and shares were included by Mr. Decker in the inventory, and for that reason have since been treated on the books of the estate as belonging to the estate.''

But the letter was admitted for one purpose only, and that was on the issue of laches, hence there is no direct evidence in the record as to why the endorsement was made.

This is an equity case and we try it *de novo* and we are not bound by the trial court's findings, but we should and do give due deference to these findings. [Aden et al. v. Dalton et al., 341 Mo. 454, 107 S. W. (2d) 1070, 1. c. 1077, and cases there cited.] ''Where a case rests on (parol) testimony alone and that testimony is conflicting and contradictory so that the question becomes one of the credibility of the witnesses who were observed by the chancellor, then this court will usually defer to his findings unless we find them to be against the weight of the evidence.'' [Ver Standig v. St. Louis Union Trust Co. et al., 344 Mo. 880, 129 S. W. (2d) 905, 1. c. 907.] Plaintiffs point out a number of facts and circumstances tending to support their contention that Adolphus Busch, at his death, was the owner of the stock in question. Among these are: (1) That certificate No. 54 was, at the time of the death of Adolphus, in his safe, that is, in his possession; (2) that at some time, after issue, it was endorsed in blank by August A. Busch; (3) that it was listed as an asset in the inventory of the estate of Adolphus; and (4) that August A. Busch was one of the trustees of the trust estate, and that certificate No. 54 was turned over (May 11, 1914) by the executors to the trustees, and, without question, remained in their possession until 1932. These are the principal facts and circumstances relied upon by plaintiffs. And they say, in effect, that the lapse of time alone is sufficient to cast doubt upon the evidence of Rassfeld.

''It is a general rule that a gift, *inter vivos*, sought to be established after the alleged donor's death, must be proven by force-

ful, clear and conclusive testimony which convinces the court beyond a reasonable doubt of its truthfulness." [Manley v. Ryan (Mo. App.), 126 S. W. (2d) 909, 1. c. 914, and cases there cited. See also In re Franz' Estate, 344 Mo. 510, 127 S. W. (2d) 401, 1. c. 404.]

It will be noted that, in finding No. 10, supra, quoted from the decree, the court found that "they (those making the inventory) represented to him (August A. Busch) that all unendorsed certificates standing in his name belonged to his father's estate and thus procured his signature in blank to all certificates, including certificate No. 54, without any examination or investigation being made by him as to the correctness of the representations."

Defendants, in their brief, say: "When the railway had but 250 shares of stock outstanding and August Busch was the owner of thirty-eight of those shares, he owned exactly 15.2 per cent of the railway. When its stock was subsequently increased to 1250 shares through the issuance of the stock dividend, and August Busch became the owner of a total of 190 of those 1250 shares, he still was the owner of precisely 15.2 per cent of the railway. When the capital was again increased, this time to 10,000 shares, and August Busch received from his father the 1330 shares in question, it brought his holdings to a total of 1520 shares. And 1520 shares was precisely 15.2 per cent of the authorized capital of the railway. . . . The foregoing facts lead to the inevitable conclusion that Adolphus Busch was giving these shares for the purpose of preserving his son's proportionate ownership of the railway."

It is, we think, of some significance that the per cent of stock issued in the name of August A. Busch remained the same. Also, if the 1330 shares were not a gift, then after the increase to 10,000 shares, August A. Busch's proportionate interest would have been reduced to 1.9 per cent of the whole stock, and would not likely have made him "satisfied and happy," and animated his zeal for the railroad, as was the desire of his father, according to the letter of July 31, 1911.

Plaintiffs (appellants) say that the gift claim is barred by both the 10 and 5 year Statutes of Limitations, Secs. 861, 862, R. S. 1929, Mo. Stat. Ann., pp. 1139, 1143, but able counsel do not tell us in what way these statutes apply, hence we pass to the assignments based on estoppel and laches. As we see it there is no estoppel in the case, and counsel, in the brief, say but little of estoppel.

Are defendants barred by laches? "Courts of equity view with disfavor suits that are brought long after the transactions litigated have occurred, and long after death has sealed the lips of those familiar with occurrences so remote in point of time." [Burdett v. May, 100 Mo. 13, 1. c. 18, 12 S. W. 1056. See also McKee et al. v. Downing, 224 Mo. 115, 1. c. 144, 124 S. W. 7; Price v. Boyle, 287 Mo. 257, 1. c. 271, 229 S. W. 206.]

Adolphus Busch died in 1914, and August A. Busch in 1934, as stated, and Lilly Busch, widow of Adolphus, died in 1930. Decker, who aided in making the inventory, died in 1915, and some book-keepers have. died since the date of the alleged gift. Also, other members of the Busch family have died, but there is nothing in the record to suggest that any of these, except Adolphus and August, possessed any information as to the alleged gift that is not shown or reflected in the record.

"Before laches can be invoked, 'the delay must have been such as practically to preclude the court from arriving at a safe conclusion as to the truth of the matters in controversy, and thus make the doing of equity either doubtful or impossible.' . . . Mere lapse of time is not sufficient to support laches." [Bickel et al. v. Argyle Inv. Co. et al., 343 Mo. 456, 121 S. W. (2d) 803, l. c. 807.]

It is our conclusion that the judgment should be affirmed, and it is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.