James CANNON et ux., Plaintiffs-Appellants,

v.

O. J. BINGMAN et ux., Defendants-
Respondents.

No. 7989.

Springfield Court of Appeals.
Missouri.

Feb. 28, 1962.

Robert J. Quigley, Harry H. Kay, Eldon, for appellants.

Theo. G. Scott, Buffalo, Gordon R. Boyer, Lamar, for respondents.

McDOWELL, Judge.

This is an action in equity for rescission of a real estate contract involving the "Red Diamond Resort" on the Lake of the Ozarks, in Camden County, Missouri, for the recovery of partial payments made on the stipulated purchase price and to have the judgment declared a special lien on the real estate which was the subject matter of the contract. The action is by the purchasers, James Cannon and Jewel Cannon, his wife, and against the vendors, O. J. Bingman and Winnie B. Bingman, his wife. The trial court found for defendants and against plaintiffs and dismissed plaintiffs' first amended petition, and for plaintiffs on defendants' counterclaim which was by the court dismissed. Plaintiffs have perfected their appeal.

The cause was originally filed May 18, 1959, and, on May 12, 1960, appellants filed their first amended petition on which the issues were made and the cause tried.

In this petition plaintiffs alleged that they had been induced to enter into a written contract with defendants for the purchase of the resort involved through fraudulent representations as to where the true boundary lines of the real estate involved were, by defendants' agent. They seek to have the contract rescinded and for judgment for the amount of money paid under the terms of the contract and that such judgment be declared a special lien against the real estate now standing in the names of defendants.

Defendants' answer to plaintiffs' first amended petition admitted that they had listed the real estate involved for sale with Frank H. Meissner, a real estate broker, but denied all other allegations. They admit the purchase of the real property sold at foreclosure sale and that they now have title to the same.

They plead laches and waiver on the part of appellants in failing to elect to rescind the contract when they discovered that fraud had been practiced upon them.

Briefly stated the evidence is: That respondents, owners of the Red Diamond Resort, listed said resort with the Ozark Realty Company for sale. Frank H. Meiss-

ner, representative of said company, showed the resort to appellants, prospective purchasers, on May 17, 1958. It consisted of 5 cabins, a house, 9 boats, 4 motors, a dock and equipment shed.

In negotiating the sale of this property to appellants Meissner took them out on the property and pointed out the boundary lines thereof. Bingman was on the property at the time but took no part in the negotiation.

Appellants' evidence is that Meissner represented to them that the north boundary line of the property was a fence which runs in a northeasterly direction.

Appellants' exhibit I is a photograph showing a portion of the resort as seen from the northeast corner and the fence, pointed out to appellants, as the north boundary line. Just south of the fence and alongside thereof is a gravel road. At the northeast corner of the property the fence makes a jog or circles around a small tract of land 25 or 30 feet wide north of the gravel road. Appellants testified that Meissner pointed out to them that this tract was used as a parking lot and was a part of, and went with, the Red Diamond Resort. The evidence is that this gravel road was 8 or 10 feet wide and that the ground north of it was higher than the road and below was lower; that this road continues on to the northeast and into the property owned by Yorks and used by them as an outlet.

Appellants' exhibit II is a photograph showing the other end of the resort from that shown in exhibit I. Meissner told appellants that the boat house and walkway, shown in this exhibit, went with the resort. The testimony is that the present gravel road, shown in the photographs in exhibits offered by appellants, is the only gravel road on the property. James Cannon testified:

"Q. You noticed this road when you were there on May 17th? A. Why, certainly. It was represented to be ours."

Appellants' evidence is that at the time of the negotiation of the sales contract they had no actual knowledge as to where the boundary lines of the property were but relied strictly upon Meissner's representations. Cannon testified that as they walked down the gravel road toward the lake, Meissner pointed out the parking lot just north of the road, told them the trees along the north side of this road could be cut down in order to enlarge the parking facilities.

The purchase contract in issue was entered into in the office of Ozark Realty Company May 20, 1958. Immediately after its signing, and before any papers were executed conveying the property to appellants, Meissner promised appellants to have a survey made showing the boundary lines to the property. The sales contract, in substance, provided that respondents convey to appellants the Red Diamond Resort, including fixtures, equipment, deep freeze and power mower, shown by attached inventory. It provided for the exceptance of 100 foot lot on which was located a poultry house. The purchase price was $32,500.00, payable $500.00 on signing of the contract, $8500.00 on delivery of deed and that respondents carry the balance of $23,500.00 represented by a note signed by appellants secured by deed of trust or mortgage on the property, payable in instalments of $900.00 on principal plus interest every six months. Sellers were to furnish abstract of title within ten days from date of contract and buyers were given ten days to examine same. Appellants paid to Meissner $500.00 on the signing of the contract. Meissner's agreement to have a survey of the property made was made just after the signing of the contract and prior to the execution of the deed and deed of trust and prior to the payment of the $8500.00. June 26, 1958, appellants returned to the Ozark Realty Company to complete the sale. At that time Meissner had in his possession a warranty deed to the resort purporting to convey it to appellants and the deed of trust and note for the balance of the purchase price, which appellants signed. Appellants paid to Meissner at that time $8500.00, as provided by the contract, were informed by him that the survey had not

been made. They examined the deed but refused to accept it until the survey was made. July 1, 1958, appellants took possession of the property. Respondents, without the permission or consent of appellants placed the warranty deed on record together with the deed of trust which appellants received some time later through the mail.

The warranty deed described the real estate in issue by metes and bounds and the last courses read:

"* * * thence South along said Quarter (¼) section line Twenty and Eight Tenths (20.8) feet to a point in the center line of a present Thirty (30) foot road; thence South Forty-five (45) degrees, Fifty-nine (59′) minutes East along the center line of said road One Hundred Forty-one and One Tenth (141.1) feet to a point; thence South Eighty (80) degrees Thirty-two (32′) minutes East continuing along the center line of said road Four Hundred Forty-five and One Tenth (445.1) feet to a point; thence South Nine (9) degrees Twenty-nine (29′) minutes West, a distance of Thirty-four (34) feet more or less, to the Six Hundred Sixty-two (662) foot contour elevation of the Lake of the Ozarks, * * *".

Prior to receiving the deed, appellants learned on July 6th, that Yorks claimed a part of the property which Meissner had represented as belonging to the Red Diamond Resort but never talked to Bingman about the matter until October 28th. On December 26th appellants made the semiannual payment on the principal with interest, by letter, and, at that time, made no statement about the title to the property.

James Cannon testified that he first approached Bingman about where the lines to the property were on October 15, 1958, and asked him if he had knowledge of the fact that Yorks were claiming a part of this property when the contract of sale was made and respondent answered "Yes" but he didn't know what he could do about the matter; that "If it is wrong, * * * I guess I will just have to go back on the other people I bought it from". Witness testified that he, again, approached Bingman about the matter around Thanksgiving, 1958. He gave this answer: "I asked him, I said, 'Well, you know this has got to be settled', and said 'Yes, I do, but' he said 'if you want to know anything' he says 'go to the Ozark Realty', he said, 'they are the ones that sold it to you', he says, 'I can't tell you a thing' ". He testified he discussed the matter with the Ozark Realty Company a number of times but "they didn't give us much recognition when we did discuss it"; that in December a payment was due, which appellants paid.

The evidence shows that after the discussions with respondents and with Meissner as to the property conveyed them by the deed, they sought the advice of a lawyer. On May 18, 1959, appellants filed their original petition.

Mrs. Cannon, appellant, testified that Meissner pointed out a point about two feet north of the tool house as being where the north line came to but that the line he pointed out included the parking area before reaching that point. On July 12, 1958, appellants executed a deed to respondents for the lot that was reserved. They testified they did not know the "whys or wherefores of the transaction".

R. W. Vincent testified in behalf of appellants that he was a registered land surveyor and had been practicing his profession for 38 years; that he made a survey of the Red Diamond Resort a year or so ago; that at the time of the survey he had the deed, executed by respondents to appellants (plaintiffs' exhibit 6). He made a paper map of this survey (plaintiffs' exhibit 8). He gave this evidence: "A. Yorks started a survey over there of this line and the man who helped me, one of my deputies, went out there and made the survey. Instead of a line being at this 34 feet north 9 degrees, 28 minutes east from the point on 662 contour it actually ran down into the lake, and I went out there the next morning then on my own, as it turned out, and we rechecked

this line which he had run according to the legal description and came out right where he said, but instead of it being up on the bank 34 feet above the 662 contour it was 55 feet to the right of that, which put it down even below the 660 contour just a little bit in the lake, which left me where I didn't know what else to do."

The witness testified that if the description in the deed, executed by respondents to appellants, was followed, the northern boundary of the property at the east end would run down into the lake and there would be no shore line on the Red Diamond Resort. He testified that he observed the roadway which runs along the south side of the fence up into the York property and was asked:

"Q. And where would this line be with respect to that roadway? A. It would be considerably below the road and this 34 feet above the 662, as I recall, would be in the upper edge of the road.

"Q. Now, if the actual bearings got out of the deed were followed as the northerly boundary of this Red Diamond would it include the tool house there? A. No."

His evidence was that the bearings as shown in the deed would exclude the gravel road and a considerable portion of the land south of the road and about 100 feet of the shore line would be lost to the resort.

On cross examination the witness testified that the angles in the description of the deed are not in keeping with the road and shore line. He stated they didn't fit. He testified that he found two statements in the deed which were contradictory to each other and could not tell which was supposed to control.

A. W. Heavener, formerly a county surveyor of Camden County, testified that while the Red Diamond property was owned by a Mr. Bass he made a survey of it; that at the time of this survey there wasn't anything there such as roads but the owner showed him where he was going to put a road; that neither the (then) roadway nor the bearings that he ran were along the present roadway bed, along the northerly part of the resort, but the bearings of the roadway he surveyed ran below the present road; that the owner was supposed to construct the road on the bearings shown in the deed and the road there now is not on that line, but the tool house would be near the end of the last course of the bearings. The line Heavener ran in 1945 or 1946 was supposed to be the center of the road but the present road is not on that line.

Frank H. Meissner qualified as an expert witness as to values of resorts on the Lake of the Ozarks. He testified that the Red Diamond Resort was worth $15,000.00 in 1958 if the north line was not the fence but ran south of the fence some 50 feet, as shown in the testimony of the surveyors. He stated if the line, as run by the surveyors, was the proper line it would be impossible to operate the property as a resort; that he got his information as to where the boundary lines approximately were from respondents; that they represented the line to be near the center of the road on the north side of the little house down there, the motor house. He gave this answer: "That is, right up in that area. There was no definite line established but is was along that fence line there, probably three or four feet, in that area."

On cross examination witness admitted he pointed out the north boundary line as about the center of the road and at a point about two feet north of the little motor house.

The evidence is that after default by appellants in the second payment on the note, given for balance of purchase price, respondents foreclosed the deed of trust, bought in the real estate and now have title thereto.

Respondents' evidence was that the gravel road south of the fence has been where it is now since 1936 and that the traveled portion thereof is some 8 or 10 feet wide.

Respondents' evidence was that appellants operated the resort from July 1, 1958, to June 1, 1960. The Cannons admit there was a survey made by the Bingmans to determine the boundary of the lot reserved and that they executed a warranty deed to the Bingmans for this property.

The evidence shows that after the foreclosure and sale of the property appellants delivered to the respondents all the property, including the personal property, purchased from them.

The judgment of the court entered January 27, 1961, was a finding in favor of respondents and against appellants on their first amended petition dismissing the petition and for appellants and against respondents on the counterclaim.

In the trial of the case the court made this statement:

"You are just saying that since the defendants fraudulently misrepresented the lines and didn't sell you the property that you thought you were getting you are entitled to have the deed set aside, the contract set aside, and your note set aside and for the money that you paid?"

To this statement appellants' attorneys stated "That's right". Then the court stated: "Well, I think you are entitled to have this proof put in there. Of course, the thing the Court will have to decide when the case is over is where the true line is. * * *"

We are first met with respondents' motion to dismiss appellants' appeal because they utterly failed to make a fair and concise statement of facts.

Supreme Court Rule 83.05, V.A.M.R., in part, reads:

"(a) * * * The brief for appellant shall contain: * * * (2) A fair and concise statement of the facts without argument. * * *

"(c) Statement of Facts. The fair and concise statement of the facts shall be in the form of a statement of the facts relevant to the questions presented for determination. Irrelevant facts and testimony and mere formal matters should not be included in the statement. If desired, such statement may be followed by a statement of testimony of each witness relevant to the points presented.

"(d) * * * The respondent in his brief may adopt the statement of facts of the appellant, or, if not satisfied therewith, he shall in a concise statement correct any errors therein. In other respects the brief of the respondent (to the extent necessary) shall follow the order of that required of the appellant."

Under this contention respondents state they have made an additional statement of facts in their brief on the merits which is "slanted toward the evidence elicited from Appellants' witnesses and which were an aid to Respondents' defense, our theory being that a condensation of the two Statements of Facts would give a total and fair statement of facts."

Carver v. Missouri-Kansas-Texas R. Co., 362 Mo. 897, 245 S.W.2d 96, 100 [1, 3] stated this law: " * * * A statement which omits the essential facts on which an appellant's adversary relies does not comply with our rules. Walker v. Allebach, 354 Mo. 298, 189 S.W.2d 282, 283 [3]. * * * Plaintiff, proceeding under Rule 1.08(c), has supplied a statement giving us plaintiff's view of the case and we are not required to search out for ourselves what is to be determined. In these circumstances, following precedent, plaintiff's motion to dismiss should be and is overruled. See v. Wabash R. Co., [362 Mo. 489] 242 S.W.2d 15, 16 [1, 2]; Brown v. Citizens' State Bank, 345 Mo. 480, 134 S.W.2d 116, 118 [1–3]; Holmes v. McNeil, 356 Mo. 846, 204 S.W.2d 303, 304 [1, 2]; Nowlin v. Kansas City Pub. Serv. Co., Mo.App., 58 S.W.2d 324, 326 [6]." Tarantola v. Johnny Hemphill, Inc., Mo.App., 324 S.W.2d 379. The court, in

the last cited case, page 380 [2] stated: "* * * On this score the appellant's brief appears to be somewhat deficient, but not enough for us to say that the appeal should be dismissed because of it."

Following the rulings of the Supreme Court on the question presented here by respondents we hold that even though appellants' brief may be somewhat deficient as to the statement of facts, yet the breach of the rule is not sufficient to require a dismissal of the appeal. We further find that if there was any failure to make a fair and concise statement of facts that error was corrected by respondents' statement which, they admit, when considered with appellants' statement constitutes a fair and concise statement of the facts.

Respondents contend that appellants failed to make timely delivery of their copy of the brief as required by Supreme Court Rule 1.09 (now 83.06). However, in their brief they state that if this court fails to sustain their motion to dismiss for lack of a fair and concise statement of facts, they do not desire to stand on the technicality of the second point so we will not consider this contention.

This being a case in equity for the rescission of a real estate contract it is the duty of the court to review the case de novo and, in doing so, this court will weigh competent evidence and reach its own conclusions as to the facts, giving due regard to the more favorable position of the trial court to judge credibility of witnesses. Euge v. Blase, Mo.Sup., 339 S.W.2d 807, 810 [1, 2]; Fisher v. Miceli, Mo.Sup., 291 S.W.2d 845, 848; Blanke v. Miller, 364 Mo. 797, 268 S.W.2d 809, 812 [1, 2]; Nixon v. Franklin, Mo.Sup., 289 S.W.2d 82, 88 [5].

In Johnson v. Duensing, Mo.Sup., 332 S.W.2d 950, 953 [1–3] the court, en banc, stated: "* * * While this is an appeal in an equity case and such appeal brings up the entire record for review and for hearing de novo, yet the Court will ordinarily consider only the issues actually presented on appeal."

In the instant case appellants charged fraud as the basis for the relief sought. The burden was upon them to prove their case by clear, cogent and convincing evidence. Euge v. Blase, supra, 339 S.W.2d page 810 [1, 2].

Under alleged error numbered II, it is contended that respondents were liable for the representations made to the appellants by their agent, Frank Meissner, as to the boundary line of the property since he was engaged in the performance of his agency, to-wit, effect of sale of respondents' property.

Appellants cite Blanke v. Miller, 364 Mo. 797, 268 S.W.2d 809, to support this alleged contention. The facts in this case are similar to the facts in the instant case. The action was to rescind a real estate transaction, the sale and purchase of four lots, to cancel notes and deed of trust executed in part payment of the purchase price and recover partial payment actually made on the stipulated price. The trial court found that the brokers were agents of the vendors; that they had misrepresented the location of lots and that plaintiffs purchased the lots in reliance upon the misrepresentations. The trial court, in finding the owners liable, stated on page 813 [3–8]:

"* * * In the circumstances, as they must be found, there can be no question as to the real estate company's liability, Fleming v. Anderson, Mo., 232 S.W. 718, and the vendor-owners' liability rests upon the most fundamental principle of agency that the vendor is liable for the misconduct of his duly appointed agent in effecting a sale, although the misconduct was without the vendor's knowledge or consent. 55 Am.Jur., Sec. 85, p. 559; Wolfersberger v. Miller, 327 Mo. 1150, 1160, 39 S.W.2d 758, 764; Judd v. Walker, supra. [215 Mo. 312, 114 S.W. 979] * * *"

Wallo v. Rosenberg, Mo.App., 331 S.W.2d 8, cited, was an action to rescind a real estate purchase and for the recovery of $7,000.00 paid vendors on the purchase price for alleged misrepresentations of the premises, occupancy, expenses and rentals by the vendors' agent-manager. There was involved in this lawsuit, among other things, the issue as to whether the sellers' manager was authorized to make the representations to the buyers concerning the premises. On page 13 [3–6] of the opinion the court stated:

"* * * It is well settled that there is no particular mode by which an agency must be established. It is necessary only that the credible facts, taken as a whole, fairly disclose that one party is acting for or representing another by the latter's authority. The relationship of agency is often to be implied from the words and conduct of the parties to the transaction, and it is not necessary that there be a formal appointment and acceptance thereof. * * * And, if there is agency, then the principal is bound if true representations as to the same matter are within the authority or apparent authority of the agent. See, Hawkins v. Laughlin, Mo.App., 236 S.W.2d 375; Restatement of the Law, Agency 2d, Art. 162, p. 384; Mitchum v. Dunlap, 98 Mo. 418, 11 S.W. 989; 2 C.J.S. Agency § 23, p. 1045."

In the instant case respondents, in their answer, admit that Frank H. Meissner was their agent with whom they had listed their property for sale. Meissner testified that he did point out the north boundary line of the property to appellants when showing the same for sale. Respondent, Bingman, did not deny appellants' testimony that he told appellants that at the time of the sale he knew the boundary line was in dispute. From all the facts and surrounding circumstances, we find there is clear and convincing proof on the part of appellants that respondents, acting through their agent,

Meissner, represented to them that the north boundary line of this property was the fence; that appellants had no knowledge of their own as to where the boundary lines were and they solely relied upon respondents' agent's representations and were, by such representations, induced to enter into the contract for the purchase of said property. We think, under the Missouri authorities above cited, that if the representations of the agent in negotiating this sale were false, respondents are liable for such misrepresentations whether they were made with or without their knowledge or consent.

Under alleged error numbered III, it is contended that the representations made by the agent of respondents were false and made as an inducement to get appellants to purchase the resort property and were fraudulent.

This alleged error is actually an abstract statement of law. From the record and the judgment of the trial court, this court is actually unable to determine that the trial court found that respondents' agent did not make misrepresentations as to the north boundary of the property, as claimed by appellants, and we are not in a position to say that the trial court did not find that the fraudulent representations did not induce appellants to enter into the contract. We have set out in the evidence a statement of the trial court which is found on page 164 of the transcript, in which he stated: "Of course, the thing the Court will have to decide when the case is over is where the true line is." This would indicate that the trial court was trying the case on the theory that the burden was upon appellants to establish the true line constituting the north boundary of the property. We are of the opinion that the trial court was in error if he used this theory as a basis for his judgment.

To support this alleged error appellants cite Bank of Brumley v. Ballenger, Mo.App., 128 S.W.2d 647. The court stated on page 652 [1, 2] of the opinion:

"* * * Therefore, in order for defendants to recover in this action the burden rests upon them to establish by proof that there was a false representation as to a material fact, known to be false by the plaintiff, or made recklessly without knowledge of its truth or falsity; that in the exercise of ordinary prudence defendants relied upon such false representation; and that they were thereby influenced to act to their damage. * * *"

In Nixon v. Franklin, Mo.Sup., 289 S.W. 2d 82, 88 (cited), the court stated: "The rule as to what will constitute fraud where representations as to title are involved is stated in Herman v. Hall, 140 Mo. 270, 41 S.W. 733, 734, as follows: 'Of course, no one questions that a mere expression of an opinion that one's title is good will not amount to a fraud even if it should turn out worthless, but it is equally well settled that a statement of a material fact for the purpose of inducing another to act upon it implies that the person who makes it knows it to exist and speaks from his own knowledge. If the fact does not exist, and the party states it as of his knowledge that it does, and induces another to act upon his statement to his injury, the law will impute to him a fraudulent purpose.'"

In Nash v. Normandy State Bank, Mo. Sup., 201 S.W.2d 299, 304 [10–12] (cited), the law is stated: "* * * If 'he states material facts as of his own knowledge, and not as a mere matter of opinion or general assertion, about a matter of which he has no knowledge whatever, this distinct willful statement in ignorance of the truth, is the same as the statement of a known falsehood, and will constitute a scienter.' * * * It is also true, in order to render a person liable in an action of deceit, the person allegedly deceived must trust to the false representation and act 'on the strength of it'."

We think these authorities properly declare the law as to the alleged misrepresentations in the instant case. Appellants testify that they were wholly unacquainted with the boundary lines of the property in issue; that they accompanied respondents' agent, Meissner, who showed them the Red Diamond Resort, for the purpose of selling the same to them; that he pointed out the north boundary line of the property as a fence. They testified they relied upon the agent's statement as to such boundary line and were induced to enter into a contract for the purchase of the property. Meissner's testimony corroborates appellants' testimony as to these representations. We think appellants' testimony is clear, cogent and convincing that the north boundary line of the property was not the fence. The description in the deed executed by respondents (offered in evidence) to appellants pursuant to the contract to purchase does not contain the property as pointed out by Meissner to them. Two surveyors, one who had originally surveyed the dividing line between the Red Diamond Resort and the resort owned by Yorks on the north, took the deed and went on the land and ran the lines, as described in the deed, and their testimony shows that the north boundary line, as described in the deed, is not the fence as pointed out by Meissner, neither is it in the center of the present road but is far south of the present road; that the line as shown by the deed would deprive appellants of some 100 feet of shore line to the property purchased and make it unfit for use as a resort. The evidence is further that respondents knew there was a contention as to the boundary line between the Red Diamond Resort and the York property at the time the representations were made by their agent to appellants. We think the evidence is clear, cogent and convincing that the real estate agent's representations as to the boundary line were not mere opinions but were statements of fact, were made to induce the sale of the property to appellants and that appellants acted upon such misrepresentations of fact to their injury.

The respondents offered evidence that for some thirty years the present roadway had been where it now is but the evidence of the

surveyors was that the calls mentioned in the deed showing the boundary line to be in the center of the road were not meant to be in the present road but in a thirty foot road which was never established.

Appellants, in their brief, state that the only issue as to misrepresentations was whether or not respondents' agent misrepresented the northern boundary line of the property and that the evidence is undisputed that he did.

■ We agree with this contention that the evidence is clear, cogent and convincing that respondents' agent did misrepresent a material fact as to the northerly boundary of this property. From the agent's testimony, under the facts as shown, the property was not worth more than $15,000.00 if the boundary line was where the surveyors testified it was. Under this testimony there can be no doubt but that it was a misrepresentation as to material facts.

We agree with respondents' first contention that equity cases are tried in this court de novo. In our opinion we have stated the rule governing our duty in such cases, citing the authorities relied upon by respondents.

Under point II respondents state that since fraud was charged appellants had the burden to prove their case by convincing evidence and failure to prove any one essential element of fraud is fatal. Citing Euge v. Blase, Mo.Sup., 339 S.W.2d 807; Salmon v. Brookshire, Mo.App., 301 S.W.2d 48; and Meyer v. Brown, Mo.App., 312 S.W.2d 158.

■ The law as declared in these authorities is found in Meyer v. Brown, supra, page 160 [2], which quotes from 37 C.J.S. Fraud § 3, page 215, as follows:

" 'Comprehensively stated, the elements of actionable fraud consist of: (1) A representation. (2) Its falsity. (3) Its materiality. (4) The speaker's knowledge of its falsity or ignorance of its truth. (5) His intent that it should be acted on by the person and in the manner reasonably contemplated. (6) The hearer's ignorance of its falsity. (7) His reliance on its truth. (8) His right to rely thereon. (9) And his consequent and proximate injury.' "

■ This rule of law has been cited with approval in many Missouri cases. Under the facts in the instant case we have stated that the evidence is clear and convincing that Meissner, agent of respondents, pointed out to appellants that the northern boundary of the property of respondents was the fence. We think this representation was practically admitted by respondents' agent. Respondents did not testify. They did not deny appellants' evidence that at the time the property was being shown for sale to appellants and at the time of the contract of sale they knew there was a dispute as to where the north boundary line between respondents' property and that owned by the Yorks actually was. We hold that under the first requirement of fraud, to-wit, a representation, appellants' evidence clearly shows there was such a representation whether willfully or recklessly made makes no difference. The falsity of the representation as to the north boundary of the property is shown by clear, cogent and convincing testimony on the part of appellants. Two engineers who surveyed the property testified that the north boundary line, as described in the deed, was not the fence, as represented by respondents' agent, but was a point far south of the fence which deprived appellants of some 100 feet of shore line and made it useless as a resort.

Undoubtedly, the evidence is clear and convincing that the misrepresentation was material because it seriously affected the value of the property. Respondents' agent, Meissner, testified that the property line, as shown by surveys, reduced the value of the property to $15,000.00.

We agree with appellants that respondents' agent's testimony shows he was igno-

rant of where the actual lines were. He testified that he pointed out generally where the north line was and then said "There was no definite line established, but it was along that fence line there, probably three or four feet, in that area". We think this evidence on the part of respondents' agent shows he was stating something to be a fact which he did not know to be a fact.

Again, we agree with appellants that the representation of respondents' agent as to the boundary lines of the property undoubtedly shows he made the same with the intent that appellants would act thereon. He was trying to sell the property in order to earn a commission and there could be no other purpose in his pointing out the lines of the property to appellants other than the purpose of inducing them to buy it.

As to appellants' ignorance of the falsity of the representations the testimony is clear, cogent and convincing that they had no knowledge whatsoever as to the boundary lines of the property and relied strictly on respondents' agent's representations.

We have stated that the testimony was clear, cogent and convincing that appellants did rely upon respondents' agent's representation as to the north boundary line of the property.

The last of the requirements, to-wit, the right to rely on such representations and the subsequent and proximate injury is clearly shown by the evidence. There was a fence which would lead any reasonable person to believe it was the north boundary line of the property. It even made a circle at the east end thereof, enclosing a small tract of land 25 or 30 feet wide, which, at the time, was being used as a parking space. There was nothing present at the time of the showing of the property that would cause appellants to even suspicion that the fence was not the line, as pointed out by the real estate agent. So, under appellants' evidence, we think the requirements of actionable fraud were met.

Respondents contend that appellants failed to tender the property and profits back and have failed to come into the equity court with clean hands. They cite Butler County, Mo. v. Campbell, 353 Mo. 413, 182 S.W.2d 589, and Reliable Life Ins. Co. v. Bell, Mo.App., 246 S.W.2d 371.

Butler County, Mo. v. Campbell, supra, was an equity action to set aside a deed on the ground of fraud. On page 592 of the opinion in 182 S.W.2d this law was stated:

"[5–8] * * * The allegations of the petition are also sufficient in respect to tender. ' * * * when the purpose of the action or cross-bill is cancellation it is not a condition precedent to the party's right to maintain the action that he tender into court the consideration he has received if he offers, in his petition, to make restitution or put the other party in statu quo. The condition precedent is upon the granting of the relief demanded and the court has the power to adjust the equities of the case and impose such terms as may be proper.' Githens v. Butler County, 350 Mo. 295, 165 S.W.2d 650, 653; Green v. Security Mutual Life Ins. Co., 159 Mo.App. 277, 294, 140 S.W. 325. The facts stated in the petition are sufficient to constitute a cause of action in equity for equitable relief on the ground of constructive fraud."

We note that at the end of the prayer of the petition these words were used "and plaintiff prayed for all other proper and equitable orders".

In the Bell case, supra, 246 S.W.2d page 376 [6], the court stated:

"Under the foregoing rule, plaintiff in this case was not required to deposit the premiums as a condition precedent to maintaining the suit. Plaintiff's only obligation was to offer to do equity; to offer to restore defendant as far as possible to the position she occupied before the policies were taken out."

In Veney v. Furth, 171 Mo.App. 678, 154 S.W. 793, pp. 802, 803 [5], [6], the court stated:

"Counsel for appellants claim that the petition is defective and fails to state a cause of action. We do not agree to this. Its facts may be defectively stated but it states a cause of action and a good one, of which a court of equity will take cognizance. All of the testimony was before the trial court and is before us. Not a suggestion was made during the progress of the trial that any of the testimony offered was out of line with the averments of the petition in the case. Not a suggestion was made that the testimony offered in the case was not responsive to the issues tendered and, as said over and over again by our courts, following the direction of our statutes, these objections come too late when made in an appellate court. * * *

" * * * If we correctly comprehend the position of counsel, it is that a tender before suit, or in the petition, an offer to pay whatever was due, should have been made. Neither is necessary. In the first place, respondents never admitted that they owed anything. In the second place, even on the theory of appellants, that something was due, the amount was entirely a matter of conjecture, certainly of dispute. In the third place, and conclusively against this claim, this is a suit in equity. In the petition, after praying for specific relief, plaintiffs pray for 'such other and further relief as may seem just and proper in the premises. Plaintiffs further aver and state that they will comply with all orders, judgments and decrees of the court and will pay such amounts, if any, as the court may order, adjudge and decree to be due the defendants or either of them.' This meets all the requirements of the case—that is—it is an offer to do equity. Neither a tender or plea of prior tender was necessary." (Citing much authority.)

In the instant case plaintiffs testify that they have returned to respondents all the property received by them from respondents under the terms of the contract to purchase. While the evidence does show appellants entered into possession of the property July 1, 1958, and received $60.00 for reservations paid in advance, they testified that in the year 1958 they made no profits. The issue as to whether any profit was made in 1959 and up until June 1, 1960, when possession of the property was delivered back to respondents, was not before the trial court. Appellants never, at any time, admitted there was any such profit and respondents never even attempted to show such profit, neither did they show what would be a reasonable rental of such property during the time.

The petition does pray for loss sustained as to profits and then states "that the Court make such further orders and judgments as shall be meet and proper in the premises."

█ Since there was no showing in the trial that there were any profits retained or made by appellants in the operation of this resort and that all the property purchased was returned to respondents, we think the allegations in the petition were sufficient and we find against respondents under this alleged claim.

Respondents' last contention is that appellants, by their unreasonable delay in asserting claim against respondents and in bringing their suit, were guilty of laches and are not entitled to recover. To support this contention they rely upon Crawford v. Metropolitan Life Ins. Co., Mo.App., 167 S.W.2d 915.

█ In this opinion on page 922 [6] the court stated: "Laches, which is purely a creation of equity, is quite different from the statute of limitations. And in this case, if the facts warranted, defendant's real complaint would have been laches, where

the length of time of the delay has little to do with the matter. * * * The length of time may be much less or much more than the arbitrary time fixed by the statute of limitations; the crucial question where laches is charged being whether the opposite party has been placed in a disadvantageous position by reason of the delay. State ex rel. Edwards v. Donovan, 226 Mo.App. 392, 41 S.W.2d 842; St. Louis Union Trust Co. v. Busch, 346 Mo. 1237, 145 S.W.2d 426. In this case fortunately for both parties there is not a suggestion that a single witness has died or has removed from the locality, and not a record which defendant needed in the case has been lost or destroyed. The advantage of the delay, for all that appears from the evidence, has been in defendant's favor in that it has retained money belonging to plaintiff for a much longer time than would have been permitted absent the delay."

In the instant case, so far as the record is concerned, respondents have not been put to any disadvantage. They did have ample opportunity, which they did not exercise, to have had this property surveyed and the line determined, which is in dispute. They do not contend they are at a disadvantage because of the loss of any evidence. They do not dispute they have had the use of appellants' money during the entire time and the court found against them on their crossbill as to alleged damages. We hold, under the authorities cited by respondents, against them on this contention.

We have pointed out that it is the judgment of this court that the trial court was in error in the theory upon which he stated he must try the case, to-wit, that it was necessary for appellants to establish that the true line was the fence. We think the only burden that rested upon appellants was to establish there was a material misrepresentation as to the north boundary of the property in dispute. The record is so incomplete as to any earnings of this property during the time it was in possession of appellants or as to the reasonable value of rentals lost by respondents, if any, that we deem it necessary that for equity to be done this case be re-tried and we express the hope that the record in the retrial will be such that the court may have a fair understanding of the case. We think the trial court should be given the opportunity to determine whether or not respondents should have a deduction for the use of the property.

The cause is reversed and remanded for re-trial in accordance with the opinion herein expressed.

RUARK, P. J., and STONE, J., concur.